HOUSTON NAT. EXCH. BANK v. MENNIS.
(No. 8230.)

(Court of Civil Appeals of Texas. Galveston. June 15, 1922.)

Fraudulent conveyances ⟨⫸⟩87(2)—Transfer of property by failing debtor to creditor in excess of indebtedness held invalid.

A sale by which a creditor took title to a drilling rig from a failing debtor, receiving by the sale three times in value of what the jury found was due him, with knowledge that the debtor was insolvent, and that the sale was made to hinder and delay other creditors, was invalid.

Appeal from District Court, Harris County; W. E. Monteith, Judge.

Action by the Houston National Exchange Bank against G. W. Mennis. From a judgment for defendant, plaintiff appeals. Reversed and remanded.

Taub, Botts & Rasberry, of Houston, for appellant.

J. A. Camp, of Houston, for appellee.

GRAVES, J. This admittedly correct statement of the nature and result of the suit is taken from appellant's brief:

"This is an action designated by our statutes as a trial of the right of property, and involves the ownership of a certain drilling rig, which was levied upon under a writ of attachment. The Houston National Exchange Bank, which sued out the writ of attachment, is styled plaintiff, and G. W. Mennis, claimant of the property levied on, is styled defendant.

"In joining issues, as required by the statutes governing actions of this character, the plaintiff alleged that on or about the 7th day of December, 1917, it brought suit against one A. C. Benson on two promissory notes, which were then due and unpaid, for the sum of $1,-350, with interest and attorney's fees, and costs, which suit is numbered 76588 on the docket of said district court, and that on or about the 9th day of February, 1918, plaintiff sued out a writ of attachment against the said A. C. Benson, which was levied by the sheriff of Galveston county, Tex., on the following described property, to wit: A certain drilling rig, etc., as belonging to A. C. Benson. That thereafter and on the 13th day of February, 1918,

G. W. Mennis, defendant herein, presented to said sheriff his claimant's oath in writing and his claimant bond in the sum of $3,000, with the American Surety Company as surety thereon. That the property levied on was valued by said sheriff at $1,500, and was delivered to the defendant, G. W. Mennis, and the affidavit, bond, and writ were returned by the sheriff to said court, and filed therein on the 15th day of February, 1918. There was no dispute as to any of the above-alleged facts except as to the ownership of the property in question.

"Plaintiff further alleged that said property in controversy at the time of said levy was the property of said A. C. Benson, and was subject to plaintiff's writ of attachment, and was not the property of said G. W. Mennis, the defendant, who was setting up some sort of a pretended claim under and by virtue of a certain bill of sale executed by A. C. Benson on or about the 22d day of November, 1917. Plaintiff further alleged that said bill of sale above referred to was executed and delivered without consideration, and for the sole and express purpose of placing said property beyond the reach of the creditors of said A. C. Benson, and of hindering, delaying, and defrauding said creditors, and especially this plaintiff, all of which was known to defendant, and agreed to and understood by him; that in truth and in fact the said sale was merely pretended and simulated, and not a real bona fide transaction.

"Plaintiff further alleged that at the time of the execution of said bill of sale the said A. C. Benson was insolvent, which fact was known to the defendant, G. W. Mennis.

"The defendant answered by general demurrer and general denial, and for special answer the defendant denied that said drilling rig, or any part thereof, belonged to A. C. Benson, nor did it belong to him at the time of the levy of said writ of attachment. The defendant alleged that he was the sole owner of said rig, and had been since the 22d day of November, 1917, when he purchased said rig from A. C. Benson, at which time A. C. Benson executed and delivered a bill of sale to him. Defendant denied that said sale or conveyance was made for the purpose of preventing said Benson's creditors from reaching said property or defrauding them, or any one else; that he purchased said drilling rig on said date in order to collect about $1,400, which the said A. C. Benson owed him at that time; that it was agreed that the defendant should pay Benson $1,500 for said rig, and that Benson's debt should apply on the consideration.

"By way of cross-bill and counterclaim the defendant alleged that the Houston National Exchange Bank, the plaintiff, acting through its duly authorized agents, caused a writ of attachment to issue and be levied on the property of the defendant, as alleged in plaintiff's petition, that said unlawful levy and seizure of his property by the sheriff, under and through the direction of plaintiff, has been the direct and proximate cause of considerable damage to him; that plaintiff, its agents and attorney, knew at the time said attachment was issued that the drilling rig belonged to the defendant and was in his possession.

"Defendant alleged and claimed that he was entitled to a number of items of damage growing out of the levying of said writ of attach-

ment and the seizure of this property by the sheriff under same.

"This cause was tried before a jury, and the court submitted same upon special issues, as follows:

" 'No. 1: Was or was not the sale of the drilling rig in question by A. C. Benson to G. W. Mennis made for the purpose of hindering, delaying and defrauding the creditors of the said A. C. Benson?' To which the jury answered: 'It was.'

" 'No. 2: Did G. W. Mennis, in taking said bill of sale, take the same in good faith, for the purpose of collecting any amount that might be owing him, or was it done for the purpose of assisting the said A. C. Benson in hindering, delaying, and defrauding his creditors?' To which the jury answered: 'In good faith.'

" 'No. 3: Did or did not A. C. Benson owe G. W. Mennis any sum or sums at the time of taking bill of sale of November 19, 1917?' To which the jury answered: 'He did.'

" 'No. 4: If you have answered the preceding issue in the affirmative, and only in that event, then answer the following issue: In what sum, if any, was the said A. C. Benson indebted to said G. W. Mennis on the date mentioned in the preceding issue?' To which the jury answered: 'Five hundred dollars.'

" 'No. 5: At the time of making bill of sale above mentioned, was or was not the said A. C. Benson insolvent?' To which the jury answered: 'He was.'

" 'No. 6: What amount of actual damages, if any, do you find the defendant, G. W. Mennis, is entitled to recover herein by reason of the levying of said attachment by the plaintiff?' To which the jury answered: 'Damages assessed at one hundred and twenty-five dollars.'

"After the return of the answers of the jury to the special issues submitted to them by the court, the plaintiff filed its motion, praying the court to enter a judgment in its favor, which motion was refused by the court, to which action of the court the plaintiff excepted.

"The defendant also filed a motion, praying the court to enter judgment in its favor, and the court entered judgment in accordance with said motion for the defendant for said drilling rig, $125 damage, and costs of court."

Appellant bank, among other assignments it is not deemed necessary to specifically discuss, urges in this court that the second finding of the jury, to the effect that the appellee took the bill of sale in good faith for the purpose of collecting any amount that might be owing to him by Benson, is not supported by the evidence. This contention must be upheld, and, since in the circumstances of the case the establishment of his good faith constituted the sine qua non of a recovery in appellee's favor, the judgment must be reversed, the preceding finding No. 1 is not clear, but if in deference to the judgment it be assumed that the purpose there found to exist was that of Benson alone, the lack of support for this second one becomes all the more apparent; upon the witness stand Benson freely admitted that he made the sale to get the rig out of

sight and to keep his creditors, particularly appellant, from at that time taking it, going into detail in affirmatively swearing that appellee both knew about and participated in such consummation. Benson, within appellee's knowledge, was at the time insolvent, wanted appellee to take the rig over to cover him up, and the two, after talking the situation over, went to an attorney's office to see about the matter. While the appellee said he didn't then know about the indebtedness to appellant, he admitted·knowing about other pressing creditors, and then testified as follows:

"When he first came to me about the rig, he told me that he came to me for the purpose of having me cover it up. I did not know when I took this bill of sale that his purpose was to cover up that rig. I knew that it was his purpose to beat everybody he could, but it was my purpose to save myself. He did come to me a few days before he executed this bill of sale, and told me he wanted to cover it up. I knew that was purpose. No question about it. After I took the bill of sale on November 19th, I do not know how much I paid Mr. Benson for it. I paid him several hundred dollars though. I do not know whether the amount that Mr. Bryant suggested there, about $1,330, is approximately correct or not."

A further feature appearing in the record is that, while the practically undisputed evidence showed the rig to be worth $1,500, the jury found Benson only owed the appellee $500 on the date of the bill of sale. In this state of the proof there could not, under our Supreme Court's holding upon the subject, be such good faith on appellee's part as would entitle him to a recovery; he knew of Benson's insolvency, of his professed purpose to at least hinder and delay his other creditors, and he got under the sale three times in value what the jury found Benson owed him. The rule is thus stated in Black v. Vaughan, 70 Tex. 49, 7 S. W. 604, and recently approved in Stevens v. Cobern, 109 Tex. 574, 213 S. W. 925:

"[A creditor] may take property reasonably proportioned in value to the amount of his debt in payment of same, because he thereby does no more than obtain a preference over the other creditors. If what he receives is appropriated solely to the payment of the debt, the sale will be upheld though the amount received be somewhat in excess of the amount of the debt. The excess must not, however, be unreasonable. But if the creditor goes further, and receives more than is reasonably necessary for that purpose, paying a moneyed consideration for the excess, he does more than to receive payment of his debt, he becomes a purchaser from the failing debtor, helps him to place his property beyond the reach of other creditors, giving him an equivalent therefor which these creditors cannot subject to their claims. In cases where the creditor receives an unreasonable amount of property from a failing debtor in payment of his debt, the law will make no estimate of

how much would have been reasonable for the purpose of sustaining the conveyance as to that much and vitiating it as to the remainder; but will set aside the whole transaction."

To the same effect are Coughran v. Edmondson, 106 Tex. 543, 172 S. W. 1106; Allen v. Carpenter, 66 Tex. 138, 18 S. W. 347.

The judgment is accordingly reversed, and the cause remanded.

Reversed and remanded.