## WILLIAMS & CHASTAIN v. LAIRD.
### No. 948.

Court of Civil Appeals of Texas. Waco.
Oct. 30, 1930.

Rehearing Denied Nov. 20, 1930.

J. M. Moore and J. K. Russell, both of Cleburne, for appellants.

B. Jay Jackson and Penn J. Jackson, both of Cleburne, and Goree, Odell & Allen, of Fort Worth, for appellee.

GALLAGHER, C. J.

This is a proceeding under the statute for the trial of the right of property in seven bales of cotton. This is the second appeal in the case. The opinion of this court on the former appeal is reported in 13 S.W.(2d) 944. The issues hereinafter discussed, however, are presented to this court for the first time in this appeal.

Appellants, Williams & Chastain, held a note against G. B. Gillespie, which was past due. They brought suit thereon in the county court of Johnson county, sued out a writ of attachment, and caused the same to be levied upon seven bales of cotton as the property of said Gillespie. Appellee, W. E. Laird, claimed to have purchased said cotton and presented his affidavit and bond for the trial of the right of property. The same were accepted by the officer who levied the writ and returned and filed in the district court of Johnson county. Appellants in their tender of issues pleaded, as ground for holding the cotton levied on subject to their writ of attachment, that the same was the property of said Gillespie, the defendant in such writ; that he was insolvent; that his transfer of the same to appellee was fraudulent; that appellee's alleged purchase of the same was subsequent to the levy of their writ; that his claim of ownership was fraudulent and asserted in bad faith; that appellee and Gillespie connived and conspired together to defeat appellants in the collection of their debt. Appellee, in reply to said allegations, pleaded that said Gillespie was absent; that he authorized his wife, Mrs. Nettie Gillespie, to sell said cotton; that he bought the same from her, paid full value therefor, and received from her the tickets issued by the yard in which it was stored, prior to the levy of appellants' writ of attachment; that he bought said cotton in good faith and without notice of any fraudulent intent on the part of his grantor; that there was in fact no fraudulent intent on the part of anyone connected with said transaction.

The case was tried to a jury. Appellants requested the court to charge the jury to return a verdict in their favor, on the ground that the undisputed evidence showed that the sale of said cotton necessarily tended to hinder, delay, and defraud appellants in the collection of their debt, and was fraudulent in law. The court refused their request and submitted the case to the jury on special issues, in response to which the jury found, in substance:

(a) That G. B. Gillespie was indebted to appellee on the 5th day of November, 1927, in the sum of about $350.

(b) That Mrs. Gillespie sold ten bales of cotton on said date to appellee, said cotton having been grown on a farm occupied by her said husband and herself, and received from appellee as consideration therefor the sum of $1,051.35.

(c) That she did not in making such sale intend to delay, hinder, or defraud appellants in the collection of their debt.

(d) That at the time of such sale it was understood between appellee and Mrs. Gillespie that he was obligated to see that the remainder of the consideration therefor in excess of his own debt was applied to the payment of other debts of said Gillespies, and that he did so.

The court rendered judgment on said verdict in favor of appellee, and appellants present the same to this court for review.

### Opinion.

Appellants present a group of propositions in which they contend that the sale of said cotton by Mrs. Gillespie, acting for her husband, an insolvent debtor, to appellee, who had notice of such insolvency, for a sum materially in excess of the amount owed to said purchaser, and the payment of such excess by a check, thus placing same at her disposal, was fraudulent in law and void as to existing creditors of said Gillespies, including appellants, and that the court therefore erred in refusing to instruct the jury to return a verdict in their favor. Appellants further contend therein that under such facts the intent which actuated Mrs. Gillespie in making such sale was immaterial, and that the court erred in submitting the issue of such intent to the jury for determination instead of instructing a verdict in their favor. Appellants further contend therein that the answer of the jury that Mrs. Gillespie did not in making such sale intend to delay, hinder, or defraud them in the collection of their debt is without support in the evidence.

G. B. Gillespie, his wife, Mrs. Nettie Gillespie, with their six children, resided on a farm located near Grandview, the property of Mrs. Gillespie and consisting of about 140 acres. Said farm was incumbered with a loan in the sum of $6,000, which was placed thereon in the spring of 1925. Gillespie cultivated said farm during the years 1925 and 1926. His operation thereof was unprofitable financially. At the end of the year 1925 he owed appellants for supplies, the debt herein sued on, and was unable to pay the same. Being unable to finance the operation of the farm for the year 1926 without assistance, he mortgaged the entire crop to be raised thereon dur-

ing said year to a bank to secure the necessary funds to do so. The crop raised that year was appropriated to the payment of such indebtedness. They were unable to pay the annual interest on the loan which became due in February of that year. Neither were they able to pay the annual taxes for said year. Early in 1927 they discussed the situation with Mr. Wade, who represented the loan company, and appellee, the brother of Mrs. Gillespie. The result of such discussion was an agreement on the part of the loan company to carry the interest and taxes then past due another year, and on the part of the Gillespies that the same should be paid out of the crop raised on said farm for the year 1927. Appellee agreed in that connection to advance from time to time the necessary money to enable them to cultivate and gather said crop. It was further agreed by all the parties that appellee was to be first repaid out of the proceeds of the crop for the advances so made by him, and the remainder of such proceeds was to be applied to the discharge of interest on said loan and taxes on said farm. Appellee knew at that time that the Gillespies were hopelessly insolvent. Appellee, in pursuance of such agreement, furnished the sum of $350 to enable the Gillespies to raise a crop on said farm, and the loan company, represented by Mr. Wade, forbore to enforce collection of its debt, interest, and taxes, by foreclosure. Some time in the summer thereafter, G. B. Gillespie surrendered the management and operation of the farm to his wife and went to Houston, where he found employment and where he continued to reside until after the transaction involved in this suit. Mrs. Gillespie raised seventeen bales of cotton on said farm during the year 1927. She sold seven bales of the same and paid for the picking of the entire crop out of the proceeds of such sale. She also paid out of such proceeds a part of the delinquent taxes on said farm, and expended the remainder for necessary supplies for the family while gathering and marketing said cotton. The remaining ten bales were stored in a cotton yard at Grandview, and she held the tickets from said yard therefor.

Appellee, on the 5th day of November, 1927, went to the Gillespie farm and bought from Mrs. Gillespie said ten bales of cotton, paying the full market price therefor. Such payment was made by deducting from the total consideration for such purchase the $350 owed by the Gillespies to him, and by giving Mrs. Gillespie a check on a bank at Grandview for the remainder of the purchase price in the sum of $701.35. She then delivered to him the yard tickets representing said cotton. Mrs. Gillespie, with reference to what conversation occurred between her and appellee at the time she sold him said cotton, testified:

"During this conversation Eli (appellee) and I had with reference to the cotton, we might have discussed Tom Wade with reference to the loan company * * * I think we discussed the loan company, the interest on the loan and Mr. Wade, out there in that conversation: I think Tom Wade's name was mentioned between Eli and I in that conversation in discussing the loan company wanting their money out of it * * * *At the time I sold my brother, W. E. Laird, that cotton I had no intention to defraud my creditors by selling him that cotton. I wasn't trying to beat Williams & Chastain nor anybody else by selling that cotton; I was just trying to save my place.*" (Italics ours.)

Mr. Wade testified with reference to the agreement heretofore referred to as follows:

"Mr. Laird agreed to let him have money to make the crop with provided we would let him have his money out of the crop first and we would get what was left, and we agreed to it. I mean by we, the loan company. I looked to Mr. Laird for that money * * * That was the interest for 1926 I was talking about. The interest payment was due February 1st. There had been no interest paid since the loan was made, and my recollection is that it was made in 1925."

He further testified with reference to a conversation with appellee on the day he purchased the cotton as follows:

"I remember the day that the cotton was levied on * * * I was in Cleburne that same morning I think * * * After I returned to Grandview I met the defendant, Mr. Laird. I don't remember where I met him at there in Grandview. I can't tell you the exact conversation I had there with Mr. Laird, but the main thing was that Mr. Laird was responsible for some interest and I wanted him to pay it. I didn't know anything about any cotton being in the cotton yard there belonging to the Gillespies * * * I was correspondent for this loan company at the time I was talking to Mr. Laird and was representing them in their business. I was handling this particular loan for them. The agreement the first of the year was for Laird to get his money out of this cotton and then the loan company were to have their money out of it. I was still following that up trying to get it."

Appellee testified with reference to the agreement the early part of the year 1927 as follows:

"In the conversation with Mr. Wade it was agreed between Mr. Wade and myself and the Gillespies that this money from this cotton crop should go on the payment of the interest on the loan. That was for the year 1927; that is the crop out of which this cotton we are fussing about came."

He further testified:

"I had a conversation with Mr. Tom Wade, agent for the loan company down there in Grandview, a little while before I went out

and bought the cotton from my sister * * * Mr. Wade told me at that time that the loan company had to have their money. He told me the loan company were wanting their money, they were wanting that cotton sold so they could get their money out of it. It was getting late in the fall and he said if there wasn't something done about it there would be a foreclosure. I don't remember everything that was said, but anyway he said they had to have their money, and for that reason and other reasons, I went out there and bought that cotton. To make a collection was one reason I bought the cotton, and the other reason was to place the money to the loan company. That is the reason I went out and bought the cotton, so Mrs. Gillespie would pay the interest she owed on her farm and satisfy Mr. Wade. I did not go down there to buy the cotton first to pay myself what she owed me of about $350.00, and to help her place the balance of it where Chastain & Williams couldn't get it. That wasn't the consideration and nothing was said about that at all. I did go down there to help my sister place this money, over and above my debt, where she could apply it on this loan. I felt under obligations to do that. Mr. Wade and I had had several conversations about that, and as I understood it, Mr. Wade was looking to me to see that he got that money. When I bought that ten bales of cotton and paid my debt of about $350.00 out of it, I did not know that I was placing the balance of that money beyond the reach of Williams & Chastain's writ of attachment, because I didn't know Williams & Chastain were going to sue." (Italics ours.)

Appellants' writ of attachment was levied on the cotton a few hours subsequent to appellee's purchase thereof. The check which appellee gave Mrs. Gillespie in part payment for said cotton would have been paid by the bank if presented to it. After the levy of appellants' attachment she became alarmed, and fearing that appellants would in some way prevent the application of the proceeds thereof to the satisfaction of the interest and taxes, she never presented the same for payment. Appellee thereafter paid the delinquent taxes and the accumulated interest on said loan at the annual maturity date of such interest. He also paid the sum of $50 owed by Mrs. Gillespie to a sister of hers in the nature of an annuity and secured by a lien on her said farm. The aggregate of said payments was about $5 less than the amount of said check, and appellee paid such remainder to Mrs. Gillespie in cash. The testimony does not disclose whether in making such payments appellee acted under express instructions from Mrs. Gillespie, but she affirmatively approved the same and surrendered to him the uncashed check in consideration thereof. It is of course impracticable to set out all the evidence, but we deem the foregoing rather extensive recital thereof ample to show whether any jury issue or issues were raised thereby.

The general rule for determining whether the court erred in refusing to direct a verdict, in submitting issues, or in refusing to set a verdict aside for lack of sufficient support in the evidence, is the same. Such rule is that in determining either of such contentions an appellate court must consider the evidence in its most favorable aspect for the opposite party, disregarding all evidence to the contrary. Stewart v. Miller (Tex. Civ. App.) 271 S. W. 311, 315, par. 4 (writ refused), and authorities there cited; Richardson v. W. C. Bowman Lumber Co. (Tex. Civ. App.) 274 S. W. 349, 351, par. 1; Commerce Farm Credit Co. v. Torrance (Tex. Civ. App.) 7 S.W.(2d) 1110, 1111, and authorities there cited; Farmers' Gin Co. v. Smith (Tex. Civ. App.) 28 S. W.(2d) 839, 841, par. 4. The rule so announced applies to the consideration of the testimony of appellee in his own behalf, and any vagueness or inconsistency therein or any conflict with the testimony of other witnesses merely raised questions of fact to be determined by the jury. Funk v. Miller (Tex. Civ. App.) 142 S. W. 24, 25, par. 1; Melburn v. Webb (Tex. Civ. App.) 277 S. W. 800, 801; Davis v. Petroleum Casualty Co. (Tex. Civ. App.) 13 S.W.(2d) 981, 983; Farmers' Gin Co. v. Smith, supra, page 841, par. 3.

The right asserted by appellants to seize said cotton after it was purchased by appellee and sell the same in satisfaction of their debt against his vendor is based solely on the provisions of article 3996 of our Revised Statutes. Said provisions, so far as applicable, are that every conveyance or transfer of any estate, real or personal, with intent to delay, hinder, or defraud creditors, shall as to such creditors be void. The very language of said article makes the test of the validity of a conveyance or transfer the intent with which it is made by the grantor. Such transfers are void only when such specific intent exists. The Supreme Court, in Sanger Bros. v. Colbert, 84 Tex. 668 et seq., 19 S. W. 863, 864, in discussing the validity of a sale made by one Dyess to said Colbert, said:

"Notwithstanding the insolvency of Dyess, the sale made by him to Colbert was not void unless, in the language of the statute, it was made 'with intent to delay, hinder, or defraud creditors.'" (Citing the statute.)

See also Cates v. Clark (Tex. Civ. App.) 24 S.W.(2d) 450, 452, par. 2 (writ refused); Cross v. McKinley, 81 Tex. 332, 335, 16 S. W. 1023; Dittman v. Weiss (Tex. Civ. App.) 31 S. W. 67, 70 (bottom second column).

The testimony of Mrs. Gillespie that in making such sale she had no intention to defraud her creditors, that she was not trying to beat appellants or anybody else by making such sale, but that she was only trying to save her place, was competent evidence on such issue.

Robertson v. Gourley, 84 Tex. 575, 578, 19 S. W. 1006; Sweeney v. Conley, 71 Tex. 543, 545, 9 S. W. 548; Brown v. Lessing, 70 Tex. 544, 546, 7 S. W. 783; Hamburg v. Wood, 66 Tex. 168, 176, 18 S. W. 623; Dittman v. Weiss, supra, page 69. The weight to be given such testimony, when considered in connection with the facts and circumstances attending such sale, was for the jury. These facts and circumstances may be briefly summarized as follows: The Gillespies agreed, in consideration of the loan company's forbearing to foreclose its lien upon said farm, that the remainder of the crop raised during said year, after repaying advances made by appellee to enable them to make the same, should be applied to the payment of taxes and interest due on said loan. Appellee, while denying legal responsibility, felt a moral obligation to see that such surplus was so applied. When he gave Mrs. Gillespie the check, he expected her to cash the same and so apply the proceeds. While the check was never cashed, the amount thereof was actually applied, with the consent and approval of Mrs. Gillespie, to the discharge of the obligations contemplated in the original agreement and a small surplus thereof applied to the discharge of an annuity which was a lien charge upon her land. This brief summary shows that the entire proceeds of said check, except the comparatively trivial sum of about $5, were actually applied in discharge of valid and existing debts owed by the Gillespies and constituting liens on said farm. Such application was not, in itself, fraudulent. Every payment of a debt by an insolvent, whether the payment be made in money or property, tends in a popular sense to hinder, delay, or defraud other creditors in the collection of their respective debts. In the absence of a law declaring preferences invalid, every debtor has the legal right to pay one or more of his just debts with any money or property he has. The intent to hinder, delay, or defraud creditors in the sense inhibited by the article under consideration cannot exist when the purpose and effect of the transfer of property is to apply it, or the proceeds thereof, to the satisfaction of one or more just debts in a manner and at a time satisfactory to the creditors to be paid. Adams v. Williams, 112 Tex. 469, 476 and 477, 248 S. W. 673, and authorities there cited. We may, therefore, in determining whether the issue raised by the testimony herein was one of law or of fact, properly limit our consideration of the reported cases to those involving substantially the same state of facts. The leading case in this state involving such facts is Sanger Bros. v. Colbert, hereinbefore cited. The facts in that case were that Dyess was an insolvent merchant. He conveyed his entire stock of goods to Colbert in consideration of the cancellation of certain indebtedness owed by him to Colbert, and in further consideration of $2,100 paid in cash. He declared at the time he received the cash that he intended

to use every dollar of it to pay his debts, and shortly thereafter he did so apply the same. We quote from the opinion in that case, page 671 et seq., of 84 Tex., 19 S. W. 863, 864, as follows:

"As Colbert (Dyess) was insolvent, the only way he had to pay his debts was to dispose of his property for that purpose. The only proper use that he could have made of his property was to dispose of it for the benefit of his creditors. *The law did not make it improper for him to either transfer the property itself in discharge of a debt, or to sell it for money, and pay the debt with the money, or to do both. It only prohibited him from disposing of it with the 'intent to delay,' etc.* * * * *The intent of Dyess in making the sale, with regard to his creditors and the disposition of the money paid him, was of controlling importance.* His own declarations, made at the time, tending to sustain the validity of his transaction, if standing alone and unsupported by other circumstances, would be entitled to very little consideration, but in connection with the other circumstance, that he did soon after pay out the money as he then said he intended to do, such evidence may be of importance. * * * *If the sale by the debtor was not with a fraudulent purpose, but was made with the sole purpose of paying his debts, that must end the case, because there cannot be a fraudulent purchaser without a fraudulent vendor.*" (Italics ours.)

The facts in Cross v. McKinley, supra, were very similar to the facts before us in this case. J. L. Mann was insolvent, and this fact was known to Cross, who was a relative. The only property owned by Mann was a tract of land consisting of 70 acres. He sold and conveyed said land to Cross for the sum of $500 under the following circumstances: Cross conveyed cattle of the value of $500 to one Johnson, to whom Mann owed the sum of $300. It was agreed by all the parties that Johnson should pay the consideration for the purchase of the cattle to Mann by canceling said debt and paying the remainder to him in cash. Shortly thereafter McKinley, a judgment creditor of Mann, levied an execution on said land. At that time the remaining $200 of the consideration was unpaid. Johnson subsequently paid said sum to Mann, who applied the same to the payment of his debts, with the exception of about $12 which he expended for necessaries for himself and family. Upon these facts the court charged the jury (pages 333, 334 of 81 Tex., 16 S. W. 1023, 1024) in part as follows:

"If you further find that the land was conveyed to defendant [Cross] in consideration that defendant would satisfy the debt of Mann to Johnson, and that defendant did satisfy said debt, yet if you further find that the land conveyed by Mann [to defendant] was worth more than was reasonably necessary to pay the debt of Mann to Johnson, and that de-

fendant did not, by the terms of the contract between himself and Mann, obligate himself to see that the excess in the value of the land, over Johnson's debt, should be paid to other creditors of said Mann,—then I instruct you that the sale from Mann to defendant is fraudulent, and you will find for plaintiff, even though you should believe from the evidence that such excess was subsequently actually paid by Mann in satisfaction of his debt."

The court held such charge error, and in that connection (page 335 of 81 Tex., 16 S. W. 1023, 1024) said:

"It will be observed that the charge referred to declared the transaction fraudulent if the facts recited existed, *without reference to the intent of the parties.* * * * *We hence conclude that the charge, in ignoring the question of intent in the parties to the transaction, is erroneous.*" (Italics ours.)

The charge so condemned by the court in that case, in legal effect, presented the contentions urged by appellants in this case. Neither said case nor the one next preceding it has ever been overruled or even questioned by the Supreme Court in any subsequent case. For other cases holding, under similar facts, that the controlling issue is the intent of the vendor in making the sale and that such intent is a question of fact to be determined by the jury, see Hadock v. Hill, 75 Tex. 193, 195, 12 S. W. 974; Meyer Bros. Drug Co. v. Durham, 35 Tex. Civ. App. 71, 79 S. W. 860 et seq. (writ refused); Terry v. Spearman (Tex. Com. App.) 259 S. W. 563, 565; Edwards v. Anderson, 31 Tex. Civ. App. 131, 71 S. W. 555, 556 (writ refused); McWhorter v. Langley (Tex. Civ. App.) 220 S. W. 364, 367, par. 9; Armstrong v. Elbert, 14 Tex. Civ. App. 141, 36 S. W. 139, 140; Wright v. Solomon (Tex. Civ. App.) 46 S. W. 58, 60, par. 6; Haas v. Kraus, 75 Tex. 106, 110, 12 S. W. 394.

■■■ We are of the opinion, viewing the testimony, as we are required to do, in the light most favorable to the contentions of appellee, that an issue of fact with reference to whether Mrs. Gillespie, in selling said cotton to appellee, intended to delay, hinder, or defraud her husband's creditors, was raised thereby; that such issue was properly submitted to the jury for determination; and that its finding thereon is not without support in the evidence.

■ Appellants present a proposition in which they assert that the court erred in permitting appellee to testify in his own behalf with reference to the agreement made the early part of 1927 that the Gillespies were to raise a crop on their farm during the year 1927; that he was to furnish them the money necessary to do so; that the loan company, represented by Wade, would not bring suit to foreclose its loan on said farm on account of default in the payment of taxes due thereon and interest on said loan; and, further, that appellee should be first paid out of the proceeds of the crop for advances so made and the remainder of such proceeds applied in discharge of such interest and taxes, as hereinbefore set out in substance. Appellants' objection thereto was that such testimony was immaterial, irrelevant, incompetent, and hearsay as to them. There is no contention that said agreement vested in either appellee or the loan company any right to the cotton in controversy in this suit. Appellee does contend, however, that his purpose in purchasing such cotton was to effectuate said agreement by securing repayment of his advances and providing funds to enable Mrs. Gillespie to pay the loan company. Mrs. Gillespie testified, in substance, that in selling said cotton she was just trying to save her place. No question of hearsay testimony was involved. The original agreement was admissible in detail for the purpose of explaining the action of the parties in the sale and purchase of said cotton and to aid the jury in determining the purpose and intent which actuated Mrs. Gillespie in making such sale. Said proposition is overruled.

We have considered all the propositions submitted by appellants as ground for reversal. None of them justify or require such action, and the judgment of the trial court is therefore affirmed.

STANFORD, J. (dissenting).

Not being able to agree with my Associates, I hereby file the following dissenting opinion:

On November 5, 1927, and prior thereto, G. B. Gillespie and wife were indebted to appellants, Williams & Chastain, in the sum of $561. On said date appellants sued the Gillespies on their indebtedness and obtained a writ of attachment against their property, which was levied upon the seven bales of cotton in controversy as the property of the Gillespies. Appellee, W. E. Laird, made claim to said cotton by affidavit and claim bond, and a trial of the right of property in said seven bales of cotton was had before a jury. The verdict of the jury being favorable to appellee, judgment was rendered accordingly, from which judgment appellants have duly appealed and present the record here for review.

This is the second appeal in said cause, the first being reported in 13 S.W.(2d) 944.

Under their first four propositions, appellants contend, in effect, that the court should have instructed a verdict in their favor as they requested; that a creditor may purchase from his insolvent debtor property sufficient to satisfy his debt, but that if such creditor purchases from his insolvent debtor property materially in excess in value of the creditor's debt and he pays over to said insolvent debtor the remainder of the excess value after satisfying his own debt, in cash

508

or negotiable paper to use and dispose of as such debtor may see fit, regardless of the intent with which the debtor conveys such property and regardless of the intent with which the creditor receives such property and pays the excess value into the hands of the insolvent debtor, and such transaction is in law fraudulent and void, neither such creditor nor debtor will be heard to say such deal was made in good faith and no fraud was intended.

The record shows that G. B. Gillespie and wife were wholly and notoriously insolvent, and that appellee, W. E. Laird, knew said parties were so insolvent. The Gillespies were indebted to appellee Laird in the sum of $350, and they were also indebted to appellants, Williams & Chastain, in the sum of $561. On November 5, 1927, appellants filed suit against Gillespie and wife and sued out and had levied an original writ of attachment on seven bales of cotton as the property of Gillespie and wife. On the same day, and a few hours before said attachment was levied, appellee, W. E. Laird, purchased ten bales of cotton, including said seven bales, from Mrs. Gillespie, his sister. The purchase price of said cotton was $1,051.35. Appellee paid himself by deducting the $350, the amount the Gillespies owed him, and gave to Mrs. Gillespie his check, payable to her order, for $701.35, the remainder of the purchase price of the cotton. Said negotiable check was delivered by appellee to the said Mrs. Gillespie without any conditions or restrictions as to the appropriation of the proceeds of said check. Appellee testified as follows:

"The reason I bought more cotton than just enough to pay my debt is because of the conversation I had with Mr. Wade. Mr. Wade represented the loan company that had loaned money on this Gillespie farm. He was agent for the company that made the loan and he was in after me about the interest on that loan. I had no interest in the place out there, only an interest that I did not want my sister to lose the place. I didn't owe Wade anything. I wasn't personally obligated to pay Wade anything, only I had told him that I would use my influence in every way to see that he got the money out of this cotton on the interest on the loan. Then after I had this conversation with Mr. Wade I went out and bought this cotton. * * *"

Appellee testified further:

"This is the check. It is for $701.35. I did not have any agreement with her (Mrs. Gillespie) that she was to hold this check. The money was there in the bank to take care of that check. I had the money in the bank at any time to cover that check. I expected Mrs. Gillespie to cash the check if she wanted to. I told her to cash the check. She asked me about it and I says, 'Go ahead and cash the check.' She says, 'I am afraid if I cash the check they will garnishee it.' She told me that was the reason she didn't cash the check. She told me that after they had already attached the cotton. I don't know just when it was, but it was sometime the next week after the cotton was attached. To make a collection was one reason I bought the cotton and the other reason was to place the money to the loan company. That is the reason I went and bought the cotton, so Mrs. Gillespie would pay the interest on the loan that she owed on her farm and satisfy Mr. Wade. * * * I testified yesterday as to why I went out there to buy this cotton; one was to collect my debt and the other was to pay the interest on this loan against the place. As to whether or not I went direct from talking to Tom Wade directly to my sister's, I must have gone out there pretty quickly. I don't remember just how long it was after my conversation with Tom Wade that I went out there.".

Mrs. Gillespie testified:

"I was afraid Williams & Chastain would try to get this money for this check, because they had attached the cotton and if I cashed the check I was afraid they would try to get it. That is the reason I never attempted to cash the check and never went to the bank to see anything about it."

Appellee testified further, in substance, that when he gave his sister the check for $701.35, he did not give it to her "with any strings on it"; that he expected her to cash the check; that after he found out she had not cashed the check, he then redeemed it by paying off some debts. The record shows appellee paid the interest on the loan in the total amount of $512. He paid this on February 6, 1928. He paid $138.44 taxes on the farm on January 30, 1928. He paid an annuity for $50 on December 31, 1927, and another annuity for $100. All of these amounts appellee testified he paid for Gillespie and wife and in this way redeemed the check for $701.35. Mrs. Gillespie held said check from November 5, 1927, until about February 6, 1928, until appellee had paid the debts above, and then returned said check to appellee. All of the above facts are established without controversy.

The appellee, Laird, had the right to purchase an amount of said cotton reasonably sufficient to satisfy his own debt against the Gillespies of $350, but he did not have the right to purchase three times the amount necessary to satisfy his own debt, and use his said excessive purchase to defeat appellants' in the collection of their demand. At the price appellee paid for the cotton, three bales would have been almost, if not entirely, sufficient to satisfy his debt of $350. Why did he buy the whole ten bales? Appellee, Laird, repeatedly answered this question to the effect that he had two reasons, one was to col-

lect his own debt, and the other was to enable his sister to pay the excess to the loan company. Appellee testified he was in no way liable to the loan company. The loan company had a lien on the farm, but none on the cotton which appellee bought. Appellee not only bought three times as much cotton as was necessary to satisfy his own claim, but gave his sister a negotiable check for the remainder, $701.35, which enabled Mrs. Gillespie, if this transaction is allowed to stand, not only to hinder and delay appellants in the collection of their debt, but to defeat their attachment proceeding altogether, and to place the remainder of said cotton or its proceeds beyond the reach of all creditors. Appellee testified, in substance, that he bought the excess cotton and gave his sister the negotiable check therefor to enable her to pay said money to the loan company, and later, when he learned she had not cashed the check, appellee, some three months after he gave his sister said $701.35 check, "redeemed" same by paying the claim of the loan company, and other amounts sufficient to absorb the $701.35 check, and then Mrs. Gillespie turned back to appellee his said check. There can be no doubt from this record but that appellee bought the excess in amount of said cotton either for the purpose of enabling his sister to appropriate said excess as she saw fit, or for the purpose of having said excess applied to debts exclusive of appellants' debt; and in either event, the result of said transaction was to hinder and delay appellants and other creditors in the collection of their debt, and was therefore, as to appellants, fraudulent and void in law. Elser v. Graber, 69 Tex. 222, 6 S. W. 560; Armstrong v. Elliott, 20 Tex. Civ. App. 41, 48 S. W. 605, 49 S. W. 635; Seligson & Co. v. Brown & Brown, 61 Tex. 180; Oppenheimer v. Halff et al., 68 Tex. 409, 4 S. W. 562; Black v. Vaughan, 70 Tex. 47, 7 S. W. 604; Willis et al. v. Yates (Tex. Sup.) 12 S. W. 232; Williams v. Moore, 6 Tex. Civ. App. 340, 25 S. W. 1010; Coughran v. Edmondson, 106 Tex. 540, 172 S. W. 1106, 1108; Paddock et al. v. Jackson, 16 Tex. Civ. App. 655, 41 S. W. 700, 702; Stevens v. Cobern, 109 Tex. 574, 213 S. W. 925; Houston Nat. Exchange Bank v. Mennis (Tex. Civ. App.) 243 S. W. 689; Watson v. Schultz (Tex. Civ. App.) 208 S. W. 958; Guaranty State Bank, etc., v. Maxwell et al. (Tex. Civ. App.) 15 S.W.(2d) 659; Oppenheimer v. Guckenheimer, 39 Fla. 617, 23 So. 9; First Nat'l Bank v. Fry et al., 216 Mo. 24, 115 S. W. 439, 443; John Deere Co. v. Sullivan, 158 Mo. 440, 59 S. W. 1005; Seger et al. v. Thomas et al., 107 Mo. 635, 18 S. W. 33. These propositions, it is thought, should be sustained. But further, under other propositions, appellants contend there was no evidence that appellee at the time he bought the cotton agreed to pay any debts of the Gillespies. It is thought this proposition should be sustained. There is no evidence whatever of any agreement or understanding had between appellee and. Mrs. Gillespie at the time the cotton was bought, and the check given, to the effect that either one of them would pay any debts, or see that the proceeds of said check were applied to the payment of any debts. There is no evidence that appellee in the early part of 1927 or any other time agreed to pay any of the debts of the Gillespies. The above being true, the sale of said cotton to appellee was void as against creditors as a matter of law and the intention with which such sale was made became immaterial. The parties cannot perform an act which the law denounces as fraudulent, and say that such act was done in good faith, with no fraudulent intent. Elser v. Graber, 69 Tex. 222, 6 S. W. 560; Seligson v. Brown, 61 Tex. 180; Black v. Vaughan, 70 Tex. 47, 7 S. W. 604; Stevens v. Cobern, 109 Tex. 574, 213 S. W. 925; Watson v. Schultz (Tex. Civ. App.) 208 S. W. 958. The sale of said cotton by Mrs. Gillespie to appellee on the terms and under the circumstances above set out was in law fraudulent and void as to other creditors, and especially as to appellants, notwithstanding the finding of the jury to the effect that Mrs. Gillespie did not intend to delay, hinder, or defraud appellants in the collection of their debt. Such was the necessary result of said transaction.

Under other propositions appellants contend further that the court erred in submitting to the jury the question of whether at the time the cotton was sold by Mrs. Gillespie to appellee Laird, "it was understood between the parties that the said W. E. Laird was obligated to see that the debts of the Gillespies were paid to an amount equal to the difference between the amount owed by the Gillespies to Laird and the value of the cotton in question." Appellants excepted to said charge because there was neither pleading nor evidence tending to raise such issue. The record shows that Mrs. Gillespie and appellee, Laird, were the only parties and witnesses to the sale of the cotton. They both testified as to what was said and done, and neither of them claimed that any understanding or agreement was had that in any way bound or obligated Laird to assume or pay any debt or debts of either of the Gillespies. Laird did not agree to assume and become liable for such interest, but turned such excess over into the hands of his sister and told her to cash the check which he thought she would do, and had done, until he got a statement from his bank of his account which showed that such check had not been cashed. This was some time after November 5, 1927. It will thus be seen the manner in which the cotton was handled not only enabled the Gillespies to convert into money the cotton, which was subject to appellant's attachment, but placed such money in the hands of the Gillespies where neither the appellants nor

the loan company nor any other creditor could subject it to their indebtednesses. None of the creditors of the Gillespies could have sued appellee because he had not made himself liable for their debts. It thus clearly appears that appellee did not by distinct agreement at the time of the sale bind and obligate himself in any form or manner to apply, or to see that the excess in the value of the cotton was applied to the creditors of the Gillespies, but expected Mrs. Gillespie to cash the check, and when he found out that she had not cashed the check for fear appellants would garnish the money, he then went, in February, three months after the levy of appellants' attachment, and paid off some debts to redeem his check. It is thought this action on his part could not give validity to the sale of the property made on November 5, 1927, which it is thought clearly was fraudulent and void, in its entirety, as to appellants and other creditors of the Gillespies. Oppenheimer v. Halff, 68 Tex. 409, 4 S. W. 562, 564; Elser v. Graber, 69 Tex. 222, 6 S. W. 560, 564.

As said by our Supreme Court in the first case cited above:

"The law gives to the creditor sufficient protection when it allows him to acquire an honest preference by the purchase of property from the debtor in good faith in payment of the sum due him; and, when the right to do this is made the pretext to place beyond the reach of other creditors property legally subject to their claims, and not necessary to the payment of his, the law will not undertake, in an entire transaction, to separate the valid from the invalid, but the whole transaction, as to other creditors, will be held invalid."

It is thought these propositions should be sustained.

Under other propositions appellants also complain of the action of the court as follows: While appellee was testifying he was asked by his counsel in reference to a conversation between himself, T. S. Wade, and Mrs. Gillespie, which took place early in the year 1927 long before the attachment was levied, to which conversation appellants objected because same was immaterial, irrelevant, incompetent, and hearsay as to any issue involved in this case, which objection the court overruled and permitted the witness to state, in substance, that early in the year 1927, about nine or ten months before the attachment was levied upon the cotton, he had a conversation with T. S. Wade, agent of the loan company, in which it was agreed between him (T. S. Wade), the witness, and the

Gillespies, that the money from the cotton crop to be raised by the Gillespies during the year 1927 should go on the payment of the interest then past due on the loan on the farm. The alleged conversation, it is thought, was immaterial and inadmissible for any purpose. It was not had at the time the cotton was sold by Mrs. Gillespie to appellee, but, if at all, was in the early part of the year 1927, some ten months before the cotton was attached. If such agreement was made, as appellants were not parties to it and had no notice of its existence, their rights could in no way be affected thereby. If made at all, it could at most only have been in the nature of a verbal chattel mortgage, of which appellants had no notice until long after their attachment lien attached to the cotton levied upon, and it is thought if such verbal agreement was made, it created no obligation upon the part of anyone. As I view the case, all the evidence without dispute shows affirmatively that the excess value of the cotton in the sum of $701, in the form of a negotiable check, was, at the very time of the sale and as a part thereof, without any restrictions as to the use of same, delivered to Mrs. Gillespie, thus placing the $701, the excess value of said cotton, beyond the reach of all creditors, and by reason of which the sale of said cotton to appellee, at the time same was made, was in law fraudulent and void as to all creditors, appellants' attachment lien on said seven bales of cotton arose at once on the levy of said writ. Elser v. Graber, 69 Tex. 222, 6 S. W. 560; Oppenheimer v. Halff, 68 Tex. 409, 4 S. W. 562; Seligson v. Brown, 61 Tex. 180; Black v. Vaughan, 70 Tex. 47, 7 S. W. 604; Stevens v. Cobern, 109 Tex. 574, 213 S. W. 925; Halff v. Goldfrank (Tex. Civ. App.) 49 S. W. 1095 (writ refused); Guaranty State Bank v. Maxwell (Tex. Civ. App.) 15 S.W.(2d) 659. And if a sale is found to be fraudulent in part, it will be deemed fraudulent in toto and set aside. Elser v. Graber, 69 Tex. 222, 6 S. W. 560; Lambeth v. McClinton, 65 Tex. 108; Black v. Vaughan, 70 Tex. 47, 7 S. W. 604; and said sale of the cotton being in law fraudulent and void at the time it was made, and appellants' attachment lien having at once attached, the subsequent efforts of appellee to have the excess value of the cotton two or three months later applied to debts other than appellants' could in no way validate said sale or invalidate appellants' attachment lien. The rights of the parties were fixed under the facts existing at the time the levy was made.

It is thought appellants were entitled to recover, and that this case should be reversed and rendered for appellants.