## HOUSTON FIRE & CASUALTY INS. CO. v. BIBER et al.

### No. 10821.

Court of Civil Appeals of Texas. San Antonio.

Dec. 11, 1940.

Rehearing Denied Jan. 15, 1941.

Boone, Henderson, Boone & Davis, of Corpus Christi, and Baker, Botts, Andrews & Wharton, of Houston, for appellant.

M. A. Childers, of San Antonio, and Chas. H. Clark and Tillman Smith, both of Corpus Christi, for appellees.

NORVELL, Justice.

This is a workmen's compensation case. The Houston Fire and Casualty Insurance Company has appealed from a judgment based upon a jury verdict awarding Mary Alma Biber, Leonard Biber and Betty Biber, the widow and minor children of Alois Biber, a recovery of $20 per week for 360 weeks because 'of the death of Alois Biber. Article 8306, Sec. 8, Vernon's Tex. Civ.Stats.

The appellant contends that the evidence is insufficient to support the jury's findings to the effect that Biber died as a result of an injury received in the course of his employment.

The evidence in the case is for the most part undisputed, and largely circumstantial. Biber died as a result of a cerebral hemorrhage, and the medical witnesses who testified upon the trial seemed to agree as to the correctness of the following text statement with reference to the cause of death: "The immediate rises in blood pressure which lead to the rupture of cerebral vessels may be due to many factors, physical and mental, among which are: muscular exertions, as lifting, running, coughing, sneezing, straining at stool, coitus, parturition and all other efforts involving such strain; and emotional excitement, as ·fear, worry and anger. Emotional states cause greater rises of this pressure than do physical efforts, and the elevation is maintained for a longer period of time. It is a popular belief and probably well justified, that a great many strokes of apoplexy occur during fits of anger."

It is appellees' theory that the cerebral hemorrhage was caused by the muscular exertions of Biber in performing his duties as an employee of the South Texas Cotton Oil Company. All of the questions propounded by appellees to their medical experts are based upon this hypothesis.

It is well settled that the coverage of workmen's compensation insurance is not the same as that afforded by life or health insurance, and that appellees had the burden of proving that Biber, during the course of his employment, suffered some injury as that term is defined by the Workmen's Compensation Act, Article 8309, Sec. 1, and that such injury was a producing cause of death. Aetna Life Insurance

Company v. Graham, Tex.Com.App., 284 S. W. 931; Texas Indemnity Ins. Company v. Staggs, 134 Tex. 318, 134 S.W.2d 1026.

Because of the nature of the case, a somewhat extended statement of the evidence is necessary in order to properly discuss appellant's assignment which challenges the sufficiency of the evidence to support the verdict.

At the time of his death, Biber was fifty-two years of age and employed as a foreman by the South Texas Cotton Oil Company. Biber had charge of a "seed house" located at Corpus Christi, Texas, which was 378 feet long, 98 feet wide, having walls 10 feet high on the sides connecting with a roof which ran up to a peak. The highest part of the roof was 51 feet above a concrete floor. The building was of frame construction with corrugated iron roof and walls, and was used for the storage of the reserve supply of cotton seed purchased by the company during the cotton crop season.

Cotton seed hauled to the storage building was unloaded into a conveyor line that ran below the floor. From this conveyor line, the seed was elevated to another line at the top of the building and distributed throughout the seed house, by the use of openings in the top conveyor line.

On September 8, 1939, the date of the alleged injury, the seed house was about nine-tenths full, the seed coming up against the wall except for a clear space of 25 to 30 feet on the west end of the building and 10 to 12 feet on the east end where there were doors. There was a tunnel constructed through the center of the building so as to allow passage from one end of the house to the other. There was also a catwalk located in the middle of the building, about eleven feet below the peak of the roof, that is a long walkway connecting with a stairway at either end of the building. From this catwalk it was possible for one to step off onto the cotton seed stored in the building.

There was a shed at the west end of the seed house under which scales were located, together with a space for a desk and counter. This shed was apparently open, consisting principally of a roof extending out over the west side of the seed house. The office of the company was situated about 75 feet from the west end of the seed storage building.

It was Biber's duty to supervise the unloading of trucks filled with cotton seed and look after the distribution of the same within the building, checking its condition from time to time for excess temperature. The number of men under his supervision varied between three and eight from time to time in accordance with conditions.

The temperature of the seed was taken by means of a special thermometer at the end of jointed metal pipes or rods. These thermometers were pushed into the cotton seed to about a depth of 20 feet, either from holes in the walls of the building or by walking out over the seed from the catwalk and inserting the thermometer in various parts of the pile of cotton seed. From 15 to 30 of these temperature tests would be made each day, so that parts of the seed pile could be opened up when danger from overheating became apparent.

It appears that on the afternoon of September 8, 1938, the sun was shining brightly and the temperature ranged between 88 and 89 degrees in the shade at 1:30 p. m. The temperature in the seed house because of its corrugated iron construction was undoubtedly much higher than that, although the seed house had a dormer arrangement that ran the entire length of the building, with windows in it, which provided a suction-like ventilation. The tests made of the cotton seed on the day in question, twenty-three in all, showed temperatures ranging from 95 to 106 degrees. The humidity was 64 per cent, 3 per cent less than normal for Corpus Christi, where the humidity is generally high due to its close proximity to the Gulf of Mexico.

Two witnesses testified as to seeing Alois Biber at the time or immediately after he suffered the cerebral hemorrhage.

K. M. Newbill testified that on the afternoon of September 8th, he saw Alois Biber at the place of business of the South Texas Cotton Oil Company; that Biber came from the direction of the seed house, stumbled and fell at the corner of the office building; that Biber was gasping for breath, wet with perspiration, unable to talk, "and just passed out at the corner of the office building," and that he and others picked him up and put ice water on him.

J. A. Trammell testified that on the same afternoon he was at the dump (scales) on the west end of the seed house unloading cotton seed; that he saw Mr. Biber for ten to fifteen minutes and he was not doing any strenuous work of any kind at the time. "We were standing there talking and he (Biber) just put his hand to his head and said 'oh, my head!' but walked on toward the office."

From the office, Biber was taken to his home and thence to a hospital where his spine was tapped and blood found in the spinal fluid. The next day he died.

In order to establish a causal relationship between Biber's employment and his death, appellees relied upon the testimony of two expert medical witnesses adduced by means of hypothetical questions. These witnesses testified in substance that death could have and probably did result from a cerebral hemorrhage brought on by physical exertion under the hypothesis stated. An examination of the statement of facts discloses that in the hypothetical questions propounded to one of appellees' experts, the following facts were assumed to be true: "that he (referring to Biber) would go up and down steps 40 feet in height and testing cotton seed and shown that on that day 23 tests were made of the heat of the cotton seed in the building by long thermometers pushed into it, which called for him to go over the cotton seed to make those tests."

The question propounded to the other expert contained similar assumptions.

There is no direct evidence that Biber, on the day he suffered the stroke, made any seed tests, climbed any stairs and went onto the catwalk, or did anything necessitating strenuous physical exertion. For proof of these matters, appellees rely upon inferences which they contend the jury could legitimately draw from the facts as hereinabove set out and the following circumstances:

1. On July 5, 1938, Alois Biber was examined for insurance and found to be in good health. The doctor who made the examination testified by deposition that he found no evidence of hypertension or high blood pressure.

2. According to Mrs. Biber, the deceased was an even tempered man, not given to fits of anger nor unnecessary worrying.

3. The manager of the employer company testified that Biber was a good workman and an active, energetic man.

4. A former employee of the company testified that he worked under Biber for about two months in 1937 and had seen Biber on the catwalk "seven or eight times." Mrs. Biber also testified that she had seen her husband on the catwalk "several times."

5. It appears that Biber was perspiring profusely when he was picked up near the office and that his clothes were wet with perspiration when he was brought home.

6. When Biber was brought home, Mrs. Biber noticed an unusual amount of cotton seed in his clothes. Mrs. Biber's testimony in reference to the presence of the cotton seed was corroborated by another witness.

There are certain other circumstances disclosed by the record that have a possible bearing upon the question involved. Mrs. Biber testified that her husband did not work the day before September 8th, as he was tired, but not sick, and they had company. Two witnesses testified that on the morning of the eighth, Biber complained of not feeling well. This was uncontradicted unless Mrs. Biber's testimony can be construed as so doing.

Francisco Valdez, a witness of appellant, testified that he had worked for the employer company since 1936; that the first thing he did when employed "was to test seed"; that he worked under Mr. Biber and was working on September 8, 1938; that he took the temperature of the seed on that day; that Mr. Biber did not take any tests that day, and that he had never seen Biber make any seed tests or do any other hard manual labor as "he was the boss there." This witness testified that he had seen Mr. Biber about 8 o'clock in the morning, and again about eleven, when Biber was out by the scales near the west end of the seed house.

The rules of law applicable to the situation presented here are:

■■ In determining the sufficiency of the evidence to support a jury finding, an appellate court will consider the evidence in its most favorable light in support of the verdict. Evidence tending to support a conclusion contrary to the finding will be disregarded, when such evidence is contradicted either directly or by inference, or if when viewed in the light of the record of the case, it possesses inherent infirmities which destroy its probative value. Williams & Chastain v. Laird, Tex.Civ.App., 32 S.W.2d 502, and authorities therein cited; 3 Tex.Jur. 1062, Sec. 749.

The testimony of a disinterested, unimpeached witness may not, however, be wholly disregarded, when such testimony contains no inconsistencies, is uncontradicted, and not improbable. Freuden-

stein v. Valley State Bank, Tex.Civ.App., 68 S.W.2d 567; 41 Tex.Jur. 942, Sec. 172.

Where the evidence shows that a particular result may possibly have occurred by reason of several different causes, and it is not more reasonably probable that one of the causes was operative rather than the others, a finding of causal relationship between the result and a particular cause can not be sustained. Davis v. Castile, Tex.Com.App., 257 S.W. 870.

If the probative force of evidence be so weak that it raised only a surmise or suspicion of the existence of a fact sought to be established, that evidence in legal contemplation is "no evidence" and will not support a finding which comprehends the existence of the disputed fact. Joske v. Irvine, 91 Tex. 574, 44 S.W. 1059; Austin v. Neiman, Tex.Com.App., 14 S.W. 2d 794.

"A presumption of fact can not rest upon a fact presumed, or in other words, one presumption can not be based upon another presumption, nor an inference of fact upon other inferences." 17 Tex.Jur. 247, Sec. 57. See, also, Texas Employers' Insurance Association v. Ford, Tex.Civ. App., 93 S.W.2d 227.

In the light of the foregoing rules, we examine appellees' theory of recovery in order to determine whether or not they have discharged the burden resting upon them as set forth in the fore part of this opinion.

The medical testimony makes it clear that there are several possible fact situations which may have caused the cerebral hemorrhage suffered by Biber. Among others, there is the possibility that the hemorrhage may have been solely the result of disease. It may have been the result of an emotional disturbance. It may have been the result of muscular exertion. It is necessary that some evidence of probative force beyond the raising of a mere surmise be introduced to exclude all other possibilities, before the remaining one can be raised to the dignity of a probability.

From appellees' medical testimony it appears that death unaccompanied by a previous history of hypertension or high blood pressure is unusual to say the least. It also appears that deaths from cerebral hemorrhage have occurred when not preceded by muscular exertion or apparent emotional disturbance. These facts leave the element of death solely by reason of disease within the realm of possibility, despite the opinion testimony of the doctor who examined Biber for life insurance during the July preceding his death.

As to the possible element of emotional disturbance, it seems that the general testimony of Mrs. Biber that her husband was an even tempered man is inherently weak when relied upon to exclude the possibility of Biber's having undergone a strong emotional experience on the day he suffered a stroke. Biber's actual movements and experiences on this day are not shown, and probably never will be known, so that death by apoplexy brought on by an emotional disturbance still remains a possibility.

It is appellees' theory that Biber shortly prior to his death underwent physical exertion or became overheated and thus the hemorrhage was brought about. This is of course a possibility, but can it be said from a proper analysis of the evidence, that the existence of this hypothesis is more probable than the existence of the other possibilities discussed?

Appellees contend that the fact that Biber was perspiring heavily when picked up at the corner of the office indicates that he had recently undergone physical exertion and that this and other outward symptoms indicated heat exhaustion. The medical testimony discloses that many of the outward symptoms of a cerebral hemorrhage and heat exhaustion are similar. As to perspiration—one of appellees' medical experts testified as follows:

"Q. Isn't it true that a man who had a cerebral hemorrhage might be perspiring heavily as a result of that cerebral hemorrhage? A. Yes.

"Q. The fact that a man who had just had a cerebral hemorrhage was perspiring heavily would not necessarily indicate that he was perspiring heavily before the hemorrhage struck him—would it? A. No sir. It would not."

The other medical expert placed on the stand by appellees testified as follows:

"Q. The fact that a man who had suffered a cerebral hemorrhage was found perspiring heavily would not necessarily indicate that he was perspiring heavily before he had this cerebral hemorrhage, would it, Doctor? A. It would not be prima facie evidence of the fact that he

was perspiring before or that the perspiration was due to or accompanied the cerebral hemorrhage.

"Q. One would not be able to tell? A. No sir."

Under the evidence of this case we do not believe it can be said without resort to conjecture or surmise that Biber had undergone muscular exertion shortly prior to the occurrence of the hemorrhage. However, if we assume that it is more probable that the fatal stroke was caused by muscular exertion, appellees still have the burden of proving that such muscular exertion had a causal connection with Biber's employment, as compensable injuries are only those "having to do with and originating in the work, business, trade or profession of the employer received by an employé while engaged in or about the furtherance of the affairs or business of his employer." Article 8309, Sec. 1, Vernon's Tex.Civ.Stats. The fact that Biber was about the premises of the employer, in itself is not sufficient to establish the necessary causal relationship. Southern Casualty Company v. Flores, Tex.Com. App., 1 S.W.2d 260.

From the testimony relating to the presence of cotton seed in the clothes of Biber, appellee constructs a theory that Biber had been engaged in making temperature seed tests and suggests as a reasonable probability the hypothesis that Biber had climbed the stairs, gone onto the catwalk and from there onto the pile of cotton seed stored in the building. It seems to us that this line of reasoning involves conjecture and surmise, the piling of one presumption upon another, and must therefore be rejected. The appellant, in its brief, suggests many possible theories for the presence of the cotton seed in Biber's clothes, all of which are as reasonable as that advanced by appellees. It appears that Biber undoubtedly was at some time during the day at the west end of the shed where cotton seed was unloaded. The presence of cotton seed in Biber's clothes shows of course that he was around cotton seed, but that inference does not justify a conclusion that he had engaged in strenuous muscular exertion in the furtherance of the affairs or business of his employer.

For the reasons pointed out, we hold that the jury findings to the effect that Biber, while in the course of his employment, underwent physical exertion or became overheated causing a cerebral hemorrhage and death, are based upon speculation, conjecture and surmise, and therefore can not stand. Joske v. Irvine, supra; Texas Employers' Insurance Association v. Herring, Tex.Com.App., 280 S.W. 740; Republic Underwriters v. Greenhaw, Tex.Civ.App., 114 S.W.2d 362; Texas Employers' Insurance Association v. Mints, Tex.Civ.App., 10 S.W.2d 220.

It follows that the trial court erred in overruling appellant's motion for judgment non obstante veredicto, and appellant's assignments predicated upon this error are sustained. This holding makes a discussion of further assignments unnecessary.

The case was apparently fully developed in the trial court and it is therefore our duty to enter such judgment as should have been rendered by the trial court. The judgment of the trial court is accordingly reversed and judgment here rendered that appellees take nothing.