**AMERICAN GENERAL INSURANCE COMPANY, Appellant,**

v.

**Ramon C. FLOREZ, Appellee.**

No. 13451.

Court of Civil Appeals of Texas. Houston.

Sept. 17, 1959.

644

Kelly, Hunt & Cullen and Robert J. Seerden, Victoria, for appellant.

McDonald, Spann & DeAnda; and Bob J. Spann, Corpus Christi, for appellee.

WERLEIN, Justice.

This is a workman's compensation case. Appellee pleaded his injuries and resulting incapacity generally. Appellant pleaded that appellee's disability was confined to the right wrist, and in the alternative to the right arm with no disability above or beyond the right elbow.

To Special Issues, the jury found that appellee, as a result of an accidental injury sustained July 5, 1957, suffered total permanent incapacity and suffered no partial incapacity. The jury also found that appellee suffered loss of use of his right arm at or above the elbow as a result of the injury, that his injury did not extend to and affect portions of his body other than his entire arm, and that such loss of use of the right arm was permanent. The jury further found that such injury extended to and affected portions of appellee's body other than and in addition to his right arm below the elbow, that he did not suffer loss of the use of his right arm below the elbow as a result of the injury, and that the effects of the injury were not limited to his right arm below the elbow but were limited to his right arm.

From the Court's judgment decreeing appellee compensation for a period of 200 weeks based on the jury's findings of permanent loss of use of his right arm at or above the elbow, appellant has perfected its appeal.

■ Appellant's first 12 Points, grouped together, assert in effect that there was no evidence of any total or permanent loss of use of appellee's right arm, and that the findings of the jury that there was total and permanent loss of use of appellee's right arm are contrary to the overwhelming weight and preponderance of the evidence.

It is necessary, therefore, to examine the record to determine whether there is any evidence warranting submission of the Issues inquiring as to whether there was any total or permanent loss of use of appellee's right arm, and further to determine whether the jury's findings to such Issues are contrary to the overwhelming weight and preponderance of the evidence.

Appellee testified he was employed by J. M. Dellinger, Inc., as a "grease monkey" and that he had to do various jobs on trucks for the company, such as lubricating the equipment, changing tires and changing batteries, and that it was necessary for him to lift heavy objects. With respect to how he sustained his injury, he testified that on the day of the accident his hand was caught in a belt, or belts, on the air compressor of the truck on which he was working. We quote his testimony as to the occurrence.

"A. It would be fan belts, just a regular belts. Of course, there were four of them on the same pulley, and it caught my finger first and then all my hand to the end, you know, turned it around all the way around, which it got my hand out of place and drove my bones in here and up in here, and got my whole arm around once, all around the big pulleys. There were four of them. And I got it out because the belts went out. When I pulled it off the belts went out and turned me loose. That is what it was, and which it got my hand out of place. And they bring me to the hospital over here. And my fingers, tore them loose and twisted my arm around the pulleys, the four of them.

"Q. Mr. Florez, at the time it happened did you feel any pain? A. Yes, sir.

"Q. Where did you feel pain? A. Well, all my whole arm.

"Q. And was there any place, besides your arm that you felt pain? A. Back in here.

"Q. Let the record show that you are pointing underneath your arm back of the delta muscle, back here. A. Yes, sir, back in here.

"Q. Well, was it hurting you at the time of the injury, just after the injury? A. Well, it hurt me so much over here I didn't feel it, but after I was, you know, after while it hurt me."

Appellee testified that he was in the hospital 5 or 6 days. His arm and shoul-

der were x-rayed and after 6 days he was told to go back to work with his arm in a cast and hand in a sling; that he went back to work flagging cars and riding a truck but not driving, for about 7 days. He did not work any more as a "grease monkey." He felt pain in his whole arm and the leaders up above the shoulder at such time, and he told Dr. Ahern how he got hurt and the doctor told him to straighten out his hand, but he could not, and that the doctor then x-rayed his hand and wrist, and applied a cast, and that he told the doctor as to what bothered him; that Doctor Ahern placed a cast on his arm all the way up to his shoulder, which cast remained for about 4 months, and then the cast was removed and a lighter one was put on up to his shoulder and that remained thereon until somewhere around November.

While he testified that after he went back to Dellinger to work his hand "was hurting and like it is now, stiff," he did not testify his arm was stiff, but did testify that his forearm was hurting and his shoulder always hurts. He tried to work around the house with his right hand and tried cutting grass, but couldn't because it was hurting too much and he couldn't lift anything. He tried to get a job processing onions but couldn't get work. He then used his truck for hauling. He drove the truck but employed a helper to load and unload it. He testified that when he put pressure on his hand, the bones moved and hurt him and it hurt when he twisted his hand, and that he could twist and turn his whole arm but not his hand.

There was other testimony as to the condition of the hand, the leaders therein, and appellee's inability to hold the steering wheel of his truck and drive it with his right hand alone, although he could drive a power-steering car therewith; and as to pain upon use of his thumb, and his inability to move his hand up and down though he could move it to the side, and his inability to turn his palm upward or lift anything, and as to the pain he suf-

fered in the leaders on top of his hand when he tried forcibly to move it.

In his deposition, taken prior to the trial, appellee testified as to how the accident happened; that when he reached for the switch the truck threw him into the belt and his right hand got caught in the belts and went under the belts into the belts and pulleys, and that his hand was in "pretty bad shape." It was "out of place and broken and cut all at the same time."

Appellee's medical witness, Dr. Jimenez, testified by deposition that he first saw appellee March 14, 1958, and again on March 17, 1958; that appellee went to see him about pain in his (appellee's) arm; that he x-rayed appellee's right wrist and forearm; that there was some atrophy of the muscles of the shoulder girdle and marked decrease in the size of the muscles of the upper arm in comparison to the left arm, which was due to nonuse of his arm because of his hand injury, "loss of physical structure of his hand and wrist"; that appellee had pain on manipulation of his wrist and pain upon manipulation of his shoulder by passive motion of the arm; that he had ankylosis of the right wrist joint with marked diminution of the dorsiflexion portion of the wrist joint, and pain on use of the wrist, and inability to use his thumb completely, and atrophy of the muscles of the forearm and of the upper arm and shoulder joint, and an ununited fracture of the terminal phalanx of the thumb, at the proximal and midthirds, and the distal end of the ulna had been resected and was not present, and sometimes in the movement of the wrist the terminal portion of the ulna would come out of place, and his main trouble was in the use of his thumb and severe degree of impairment of dorsiflexion of the wrist and of the "disuse" atrophy of the muscles of the entire arm; that he had pain on movement of his wrist and arm, and muscle atrophy but no muscle tension, and that appellee would try to prevent anyone from

moving his arm and his wrist because of pain.

To a hypothetical question, and basing his answer on medical probability, Dr. Jimenez testified that appellee could have injury to the hand, wrist, elbow and shoulder joints from the manner in which it was assumed the accident occurred, and further that the complaints of appellee of pain in his hand, wrist, forearm, upper arm and shoulder could be consistent with the type of injury appellee received as assumed in such question; that appellee's disability for his previous type of work based upon reasonable medical probability was, in his opinion, at least 30 to 35 percent of the entire arm, and that based upon reasonable medical certainty appellee could be more susceptible to future injury due to the decreased function, and probably would be; that there was no change in appellee's condition on October 9, 1958, and in reasonable probability and medical certainty his condition was permanent.

When asked whether the injury affected other parts of appellee's body other than his hand, Dr. Jimenez testified he thought it affected both his shoulder and his elbow joints, due to the strain that the muscles received in turning the hand backwards; that he thought appellee had some injury to the elbow and shoulder joints at the time of injury; that he presumed disuse of the arm caused the atrophy, and that the muscles could not rebuild themselves through exercise to the extent they formerly were, but to a very minor degree they would develop some and become useful again, and the condition was permanent; that appellee can move his elbow so long as he doesn't move his hand, and can raise his arm over his head though it would cause him pain to a certain extent in the shoulder area due to disuse atrophy in the muscles around the shoulder; that appellee's hand is at least 50 percent ruined; that in speaking of 35 percent disability to the arm he was kind of averaging pain in

appellee's shoulder with the disability of the hand; that the elbow joint is perfectly all right and 100 percent able, and there is nothing wrong with the shoulder joint, but there is some muscular pain when appellee raises his arm; that he has loss of strength throughout the whole arm from disuse, and has lost at least 35 percent as far as function thereof is concerned.

Dr. Jimenez further testified that he believed from the history of the case that appellee received a wrenching of his shoulder, and that the residual of the injury remained although the soft tissue swelling and "all that at the time of the accident", had disappeared; that such shoulder injury was taken into consideration in the doctor's evaluation of appellee's 35 percent disability to the entire arm; that the atrophy could also have resulted merely from disuse of the hand and forearm.

Appellant's witness (Dr. Ahern, testified by deposition that he examined appellee on August 31, 1957; that from the history he took, his examination and study of x-rays, appellee had a rather obvious deformity and injury to his right wrist and right thumb, an old fracture at the end of the radius with dislocation of the radio-carpal joint (wrist joint); that he examined appellee's forearm, upper arm and shoulder and found no bony defect; that he would expect in six or seven weeks from the date of injury some atrophy; that he operated on appellee's wrist and thumb, and the thumb and wrist were incorporated in a plaster cast which was replaced September 17, remaining until November 5, when a splint was put on. Dr. Ahern prescribed routine immobilizing exercises starting with shoulder and extending to elbow and down to finger; that on December 14 he re-examined appellee and stated he could go back to work two weeks after that date; that he had no record of examining appellee's shoulder and no record of any complaints relative to the area of the shoulder or of the elbow; that appellee

hadn't been allowed to use his arm, because "we are holding it still for this joint to fuse, and you would expect considerable atrophy—it is routine in everybody that has a cast for any length of time, and that when activity is resumed, the muscles again achieve a normal tone and bulkiness though they may never gain complete size and strength, but usually approach it rather closely" ; that appellee had a 25 percent permanent disability to the right wrist; that to a certain extent there would be a temporary disability to the shoulder from immobilization, of maybe three months, as a concomitant going with the 25 percent disability of the wrist; and that he confined appellee's disability to his wrist and forearm since there was some interference with rotary motion after his wrist was fused.

To hypothetical questions propounded by appellee's attorney reciting appellee's contention as to how the injury occurred, Dr. Ahern testified that it could be assumed that the same force could injure a shoulder; that conceivably the injury can be transmitted up the arm somewhat and it would be reasonable and logical in his opinion that it would have been transmitted into the shoulder and elbow to some degree; that he did not have any history of the kind of injury referred to in the questions of appellee's counsel, and assumed that the injury to the wrist was a blow type; that pain on use of a member causes disability of such member and that where a hand is cut off, the patient is disabled until he no longer feels pain resulting from the amputation; and that a certain amount of pain could be disabling to one man and not to another; that he was confining his diagnosis to disability to function; that sprains are sometimes permanent; that he confined his examination entirely to the wrist and fingers.

Appellant's witness, Dr. Renger, testified that he treated appellee, sewed up the laceration on the thumb, reduced the dislocation of the wrist and also the fracture, aligned it and put on a splint cast; that he last saw him on July 29, 1957, when appellee asked to be referred to a doctor in Mathis, Texas; that appellee never complained of any injury to his elbow or shoulder during the time he was under the doctor's observation from July 5 to July 29, 1957, and no evidence of injury to the elbow or right shoulder was found; that it is not the case that where there is an injury to the lower extremity of the arm that one would be justified in saying there was disability in the upper extremity of the arm and such was definitely not the case in Florez' case, and there was nothing wrong with his shoulder.

We have made a very careful and painstaking review of appellee's testimony and that of the three doctors who testified. The testimony of the doctors refutes appellee's claim of total and permanent disability of the right arm. However, it is recognized that the testimony of the injured party may outweigh that of medical witnesses who are not confronted with the problem of living with the injured member and who are generally not in as good a position as the injured party to evaluate the severity and extent of his pain and the disabling effects thereof.

There is testimony from which the jury were warranted in finding that appellee sustained some injury to his upper right arm and shoulder, and that the original injury was not limited to the hand. In this respect the case is distinguishable from Texas Employers Insurance Ass'n v. Brownlee, 152 Tex. 247, 256 S.W.2d 76, and several other cases cited by appellant. The jury had a right to believe appellee's testimony. Any vagueness or inconsistency therein, or conflict with the testimony of the doctors merely raises questions of fact to be determined by the jury. Insurance Company of Texas v. Anderson, Tex.Civ. App., 272 S.W.2d 772, ref. n. r. e.; Williams & Chastain v. Laird, Tex.Civ.App., 32 S.W.2d 502, writ ref. The jury is the

sole judge of the credibility of the witnesses and the weight to be given their testimony.

Appellee's testimony shows that at the time the accident happened he felt pain in his whole arm; that he told the doctor when asked what bothered him, "Well, my wrist and the shoulder and all my muscles in here, the leaders," and that Dr. Ahern placed a cast on his arm all the way up to his shoulder, which was later removed when a lighter one was put on up to his shoulder. He testified that his shoulder always hurts, and that though right-handed, his right arm, which was larger than the left prior to the injury, was smaller than the left; that he could drive his truck but employed a helper to load and unload it. When asked whether he was having any kind of trouble at the present time, he testified, "Well, just my hand and my arm and shoulder" and "of course, it didn't hurt so bad when doing nothing; it doesn't hurt. But start doing a little, it hurts." He then testified:

"Q. You didn't have a helper before you got hurt when you worked with your truck? A. No.

"Q. All right. Now, there has been some testimony here about pain, Roman. Now, has that pain—state whether or not that pain prevents you from carrying on the ordinary jobs that you did carry on, such as lifting, turning, twisting and moving, as far as maintenance on the truck is concerned. A. Yes, sir, it hurts me and I can't do it. The pain won't let me do it."

He also testified that he couldn't lift his arm without pain.

Dr. Jimenez' testimony shows that there was some atrophy of the muscles of the shoulder girdle and marked decrease in the size of the muscles of the upper arm in comparison to the left arm, which was due to non-use of the arm because of his hand injury, and that appellee had pain on manipulation of his wrist and also pain upon the manipulation of his shoulder, and atrophy in the muscles of the forearm and upper arm and shoulder joint, and that he had pain on movement of his wrist and arm, and that appellee would try to prevent anyone from moving his arm and wrist because of pain, and that in reasonable probability the existing condition was permanent. He testified that he thought the injury affected appellee's shoulder and elbow joints, due to the strain that the muscles received in turning the hand backwards, and that he thought appellee had some injury to the elbow and shoulder joints at the time of injury, and that there is some muscular pain when appellee raises his arm, and further that he believed that appellee received a wrenching of his shoulder and that the residual of the injury remained, and that such shoulder injury was taken into consideration in the doctor's evaluation of appellee's 35 percent disability to the entire arm.

As hereinabove stated, Dr. Ahern testified that a certain amount of pain could be disabling to one and not to another, and that sometimes sprains are permanent. In his report to the company, made August 22, 1957, he stated, "This man's upper right extremity is completely disabled for any type of work at this time," explaining that if one broke his wrist he could not use his right upper extremity.

It was not definitely shown how much of appellee's disability resulted from injury to the upper arm and shoulder and how much from the injury to his wrist and thumb. The jury and the trial judge, however, heard appellee's testimony and were in a better position than this Court to evaluate his testimony when the witness referred to his pain by indicating or pointing without testifying definitely as to its location. It is true that we might have decided the facts differently from the jury, but we are not warranted in substituting our opin-

ion or findings for those of the jury unless the jury findings are so against the overwhelming weight and preponderance of the evidence as to be manifestly unjust.

There is no fixed rule of evidence by which a claimant is required to establish the fact that he has suffered an injury that caused permanent total disability. See Traders & General Insurance Co. v. Daniel, Tex.Civ.App., 131 S.W.2d 276, dism., judgment cor.; 45 Tex.Jur., p. 589, par. 162. As stated in Employers Reinsurance Corporation v. Jones, Tex.Civ.App., 195 S.W. 2d 810, 812, ref. n. r. e., "The duration and extent of disability resulting from injury is at best an estimate which must be determined by a jury from all the pertinent facts before it."

The issue as to disability may be established by the claimant alone, and this is true even though his testimony may be contradicted by medical witnesses. 45 Tex.Jur., p. 592, Sec. 163.

There is some testimony from which the jury might have inferred and found that plaintiff sustained a total loss of use of his right arm, and that such loss of use is permanent. After examining all of the testimony, both that supporting the verdict and that militating against it, we cannot say that the jury's findings are so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. King v. King, 150 Tex. 662, 244 S.W.2d 660; Dyer v. Sterett, Tex. Civ.App., 248 S.W.2d 234; Tudor v. Tudor, Tex., 314 S.W.2d 793.

In its next two Points appellant asserts that the Trial Court erred (1) in submitting Special Issue No. 10 for the reason that such Issue inquired only as to whether the appellee suffered "loss of use" of his right arm rather than "total loss of use" and (2) in refusing to submit appellant's requested Issue No. D-7 inquiring as to "total loss of use."

Appellant has failed to include in the transcript the Court's charge. Hence, we are unable to determine how the phrase "loss of use" was defined, if it was defined. It seems likely that any definition given by the Court probably embraced and was limited to "loss of use" as that term is used in Article 8306, Sec. 12, V.A.T.S., and as it is generally defined. See Traders & General Insurance Co. v. Porter, Tex.Civ.App., 124 S.W.2d 900, writ ref. If a proper definition of the phrase "loss of use" was given by the Court, we fail to see how the omission of the word "total" could be reversible error, since if the word "total" had been inserted in the Issue the jury would still have been guided in their deliberations by the same controlling definition.

Generally, rulings of the trial court are presumptively correct, and an appellate court will consider only matters shown by the record. Fenton v. Wade, Tex. Civ.App., 303 S.W.2d 816, ref., n. r. e.; Boyd v. Robinson, Tex.Civ.App., 304 S.W. 2d 430. Also, appellant failed to submit any definition or explanatory charge in connection with its requested Special Issue No. D-7. We think this should have been done as a prerequisite to its right to complain since such Issue is not worded in the language of the applicable statute.

In its last two Points appellant asserts that the Trial Court erred in allowing Dr. Jimenez in his deposition to testify as to the "possibility" or "probability" of the types of injuries and damage which might have occurred as a result of an accident such as the one in question, such testimony being conjectural only, and also because the Court allowed said doctor to testify as to the possibility or probability of appellee being re-injured in the future.

These Points are so indefinite that it is questionable whether we should consider them at all. Nevertheless, we have carefully done so and have concluded that they are without merit.

In its statement under said Points appellant refers to the statement of facts, pages 124 through 129, where Dr. Jimenez was asked what parts of the body would be affected by an injury such as appellee sustained, and testified, "Well, he can have injury to the hand, wrist elbow and shoulder joints." Appellant's objection was that the hypothetical question soliciting such answer included assumptions of facts not in evidence. In its brief, however, appellant complains only because the answer is speculative and conjectural. The doctor elsewhere testified that appellee had sustained injury to his hand, wrist, elbow and shoulder. The above statement is merely cumulative of testimony in the record without objection and therefore if its admission was error, it is harmless. By such statement the doctor in effect attributed an existing injury and condition to the accident in question, which, of course, was proper. Moreover, appellant is in no position to complain since no objection was made when the doctor's deposition was taken, and the record includes the Trial Court's reference to an agreement stipulating that objections not made at the time of the taking of the deposition would be waived.

Medical testimony is admissible as to the possibility that a condition already in existence has been caused by a prior injury. It is also well settled that medical testimony of future consequences of an injury must be limited to reasonable probabilities.

The testimony of Dr. Jimenez as to appellee's being more susceptible to future injury was based upon reasonable probability, and was therefore admissible. Traders & General Ins. Co. v. Bass, Tex. Civ.App., 193 S.W.2d 848, ref., n. r. e.; Houston & T. C. Ry. Co. v. Fox, 106 Tex. 317, 166 S.W. 693; Texas Employers Ins. Ass'n v. Talmadge, Tex.Civ.App., 256 S.W. 2d 945, at page 952.

Judgment affirmed.