**TEXAS EMPLOYERS INSURANCE ASSOCIATION, Appellant,**

v.

**Clyde SMITH, Appellee.**

No. 6602.

Court of Civil Appeals of Texas.

Beaumont.

Dec. 12, 1963.

Rehearing Denied Jan. 8, 1964.

Keith, Mehaffy & Weber, Beaumont, for appellant.

Carl Waldman, Beaumont, for appellee.

STEPHENSON, Justice.

This is a suit brought under the Workmen's Compensation Law of Texas. Plaintiff recovered judgment, based upon finding of the jury, for total and permanent disability. The parties will be referred to as they were in the trial court.

Defendant contends that there was no evidence to sustain the findings of the jury as to total and permanent disability, that there was insufficient evidence to sustain such findings, and that such findings were against the great weight and preponderance of the evidence. These contentions were raised by 5 separate points which were then briefed and argued together. The defendant treats the legal import of each as being identical to the other, and actually only asks this court to consider the record as a whole and to remand the case for a new trial. The defendant, in effect, abandons the point of "no evidence" and relies solely on the points of "insufficient evidence" and "against the great weight and preponderance of the evidence".

A consideration of these points necessarily requires a review of the testimony

of the witnesses as to the physical condition of the plaintiff. The record shows that plaintiff was injured November 22, 1957. The fact that plaintiff received a serious injury is not controverted. The defendant furnished plaintiff an operation to repair a herniated disc February 25, 1958. Plaintiff returned to work May 12, 1958, and has continued to work for the same employer to the date of the trial, May 22, 1962. That plaintiff was at all material times employed as a vat operator which is a job requiring climbing and walking. That plaintiff's wage rate was $3.03 per hour on the date of the injury, and $3.33 per hour at the time of trial. Plaintiff had been working 40 hours per week at both times. There is no evidence that plaintiff lost any time from word because of this back injury in 1959, 1960, 1961, or 1962 to the date of trial. Defendant offered evidence that plaintiff was able to do his work as a vat operator, and had been doing it, without complaint. Dr. Earl Rafes, a witness called by defendant, testified as follows:

In reference to a myelogram taken by Dr. Tyner December 16, 1960 he testified:

"* * * In my opinion, this myelogram does not represent in any way a herniation of the disk, but merely represents a thickening of the annulus or covering which the disk had originally, and you see the disk is entered not from here, but from the sides, so this covering remains, or and it represents a little thickening of the edge of the bone in this area and does not represent a herniated disk."

"Q. The last time you saw him, did you find anything organically wrong with him to justify the complaints that he was having at that time?

"A. No.

"Q. You found nothing wrong with him that was not wholly voluntary?

"A. I would think the basis for his complaints were unfounded the last time I saw him; that he does not have a perfect back; if he attempted to do extremely heavy labor, he might have difficulty and I would say he would; there's no justification for further treatment in this case."

On the other hand, the plaintiff testified he had a wife and five children, and as follows:

"Q. Now, after you went back to work and up until this time, how have you made out with your work?

"A. Well, I've struggled along with it.

"Q. What difficulty have you had? Let's take in climbing, do you still do climbing?

"A. Yes, sir, it's part of my job.

"Q. Well, how do you make out doing the climbing?

"A. Well, I don't do so well on it. It bothers me a lot when I climb.

"Q. What bothers you?

"A. My legs and back.

"Q. Did you ever have that kind of trouble before this accident happened to you?

"A. No, sir.

"Q. Do you go ahead and do the climbing anyway?

"A. Yes, sir.

"Q. Do you have to do a little bit of walking?

"A. We do lots of walking.

"Q. You do lots of walking?

"A. Yes, sir.

"Q. How do you make out doing the walking?

"A. It tires me out and bothers me a lot to have to walk. I use my car on the job.

"Q. Well, how do you use your car?

"A. From the blending station, we have a place there we work from and we have those tanks we have to read now, keep switching them around, we have to gauge them, and they're a pretty good ways apart, and I use my car.

"Q. You keep your car out there at the plant?

"A. Yes, sir.

"Q. Did you ever have to use your car before out there?

"A. No, I never used it before."

"Q. How about climbing over those tanks and vats?

"A. We climb, but I don't do too much bending. I can't.

"Q. Why can't you?

"A. If I done much bending, I believe it would put me in the bed.

"Q. Did you have any trouble like that before this accident?

"A. No, sir.

"Q. Can you do any lifting or anything like that without it hurting you a great deal, Clyde?

"A. Well, I haven't tried too much lifting since I had my operation, but it bothers me to lift.

"Q. Have you ever gone out and taking a physical to go to work any place other than Texas Gulf Sulphur since you went out?

"A. No, sir.

"Q. You've been working there for them?

"A. Yes, sir.

"Q. Have you ever taken a physical before for other work?

"A. Yes, sir.

"Q. Clyde, what is your situation now? How do you feel, how do you get along?

"A. I hurt all the time. I mean, I'm in misery all the time.

"Q. Are you the same all the time?

"A. Well, it bothers me at times worse than it does other times.

"Q. Are you really able to do this work you're doing out there, Clyde?

"A. Well, I wouldn't think so.

"Q. Why aren't you able to do it?

"A. Well, it's just too much walking and climbing.

"Q. And do you do it in a lot of pain?

"A. Yes, sir.

"Q. Do you feel that you're getting better or worse?

"A. I'm about the same.

"Q. You mentioned your legs. What kind of trouble are you having with your legs?

"A. Well, I have trouble with my legs. My right leg and hip bothers me a lot when I do walking and climbing.

"Q. Can you describe the pain to the jury?

"A. Well, it goes down in my legs, plumb down to my ankles.

"Q. Did you have that same type of pain before the operation?

"A. Before the operation, no, sir.

"Q. You had some leg pain before the operation, didn't you?

"A. Before the operation, I had a little pain in my leg.

"Q. Is the pain worse in your leg since the operation than it was before?

"A. Yes, sir."

"Q. Clyde, which man told you to do what that you couldn't do?

"A. Mr. Rudin, Bobby Rudin.

"Q. What did he tell you to do that you couldn't do?

"A. He wants us to change those lines and change those ropes on the tanks.

"Q. On the tank or on the vat?

"A. On the tanks and the lights on the vats.

"Q. The rope on the tank, the thing that holds that measuring stick?

"A. Yes, sir, it's on a little track you have to climb up.

"Q. Did you change it?

"A. No, sir.

"Q. Why didn't you?

"A. I didn't feel like it.

"Q. What do you mean?

"A. I didn't want to climb up there.

"Q. Why didn't you want to climb up there?

"A. I wasn't able to.

"Q. Did he ever jump on you about it?

"A. No, sir, he never said anything to me.

"Q. Who ended up changing that rope?

"A. The one that relieved me. Adair, I believe, changed it the last time.

"Q. At any time you have to change them, it's when they're being used?

"A. That sulphur rots them out.

"Q. And the lights were on the vat?

"A. Yes, sir.

"Q. Where were those lights on the vat?

"A. The lights on a vat is on the top of those ladders, that deal he's drawed off; the side of the vat that goes up above the vat. They go higher, where the pipe can hang out over the forms and the lights are up above that.

"Q. You'd have to climb way up?

"A. You have to go up higher to get to the lights.

"Q. Did you change those lights?

"A. No, sir, I don't change no lights.

"Q. They go out from time to time?

"A. Yes, sir.

"Q. And you don't change those?

"A. No, sir.

"Q. Why not?

"A. Because I'm not able to climb. I'm scared to climb up there."

Dr. Furman H. Tyner, a witness called by plaintiff, testified he was a radiologist, and took a myelogram of plaintiff's back December 16, 1960, and as follows:

"Our positive finding was the protrusion of some of the fourth disk up to produce a knot in the column. The opaque column as it lies down envelopes at the protrusion and produces this knot going up into the vertebral canal and thus displacing that much of the opaque oil. That was the positive finding at four."

"Q. Doctor, I have just a couple of questions. First of all, based upon

your myelogram, your myelogram report there, is it your conclusion or opinion the defect you found there, the notches, are compatible with a ruptured disk at that level?

"A. At the fourth disk level, yes, sir.

"Q. Now, Doctor, is that the same disk level that was operated on?

"A. Yes, sir.

"Q. Is it your opinion that there is still some material left there or has come out somewhere that has protruded into the intervertebral canal and the paramedian?

"A. Into the intervertebral canal, whether or not there's any in the foramina you couldn't tell from an x-ray picture or myelogram. There is extraneous or disk material from the fourth disk protruding out of its normal confines, which is variously classed as protrusion, herniation or rupture. It means the same thing."

Dr. James Albert Brown, a doctor called by plaintiff testified as follows:

"A. Well, the history of the type of injury, letting himself drop to his feet and jarring himself, that's one of the ways in which we get these disks, and then subsequent history, the way he gradually became worse and went in for myelograms and operation and his improvement after the operation for a period of several weeks and then getting worse again, especially when he was up and around or bending excessively. And that condition lasted a good bit more than six months and at the end of six months, I would consider it chronic and considered it time to do something else with this individual anyhow, but it was considerably more than six months. So, I considered that this individual within reasonable probability had a permanent condition in his back, requiring further surgery, and accordingly, sent him in for a myelogram to see whether I was going to have to do something for his disk at the time of the operation, which I had recommended that the individual take, and at the time of the myelogram, found some protrusion of the fourth lumbar intervertebral disk and found the column of fluid sitting back from the fifth disk so far that it would be possible to have a hernia there. So, consequently, the myelogram was helpful, in that if he permits me to operate on that back, I shall explore the fourth disk and the fifth disk to see what was irritating them, because scar tissue would not show in the x-rays or in the myelogram in many instances.

"Q. Doctor, with regard to a fusion in this area, what is your recommendation based on reasonable medical probability?

"A. Well, I recommend that he have the fusion, plus exploration of the disks and nerve roots at the fourth and fifth lumbar disk levels."

"Q. Now, Doctor, I heard you say you felt his condition was chronic or permanent, is that correct?

"A. It's my opinion that that is the situation.

"Q. Doctor, considering the type of work this man advised you he was doing, that he's required to do a lot of climbing, walking, stooping and bending, and some lifting, do you feel he can do that usual type of work that he has been doing, that he's able to do it?

"A. In my opinion, he is incapable of doing heavy manual type of labor, requiring heavy lifting or excessive stooping or pushing without suffering a great deal from it.

"Q. How about climbing?

"A. I would say climbing is pretty difficult, too, but not as bad as, in this particular instance, as lifting or carrying heavy loads or something of that sort.

"Q. How about walking long distances?

"A. Walking, yes, it would be difficult.

"Q. Doctor, do you feel that if you were to see him for an industry, would you pass him for employment, could he get a job if you or any other competent doctor would examine him and tell him what his condition was and his complaints?

"A. I wouldn't pass him for employment. I can't speak for the other doctors."

"A. In my opinion, this individual is definitely handicapped and certainly moderately disabled and incapable of competing on an equal basis with other men in doing heavy manual type of labor."

Merle Smith, plaintiff's wife, testified as follows:

"A. He doesn't get to do anything hardly around the house. Before he was hurt, he always had a garden, trimmed the hedges, mowed the lawn and was at work all the time, just about. He can't do any of that now.

"Q. What about now, this long after the operation, is he getting back to his yard work?

"A. No, he tries every once in a while, but he can't hold up at it. He can't do anything.

"Q. When he does, what happens?

"A. Well, he gets down; he hurts worse.

"Q. What about in the morning when he gets up, tell the jury what you told me.

"A. He can't hardly get out of bed. It takes him a while to get straightened up. He's stiff and hurts.

"Q. Mrs. Smith, just tell the jury the difference in him since this operation and since he got hurt?

"A. Well, it's all together different. He can't do any work like he used to. He wants to do it, but he's not able. If he tries it, he gets worse. Of course, that's not good for anybody, they like to get out and do their own work. It makes them nervous to see a lot of things that need to be done and can't do it."

Several witnesses called by plaintiff testified about plaintiff's complaints of pain after the operation and until the date of the trial, and of plaintiff's difficulty in climbing and walking. Lawrence Nelson, a witness called by defendant, testified that plaintiff spent a great deal of his time while on the job, laying down and sitting down.

■ Considering the record as a whole, as we are required to do, in passing upon the points of "insufficient evidence" and "against the great weight and preponderance of the evidence" we cannot say that the jury's findings are so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. King v. King, 150 Tex. 662, 244 S.W.2d 660.

■ There seems to be no fixed rule of evidence by which a claimant is required to establish the fact that he has suffered an injury that caused permanent total disability. The rule seems to be that where it can reasonably be inferred from the evidence that the plaintiff's injuries are permanent and totally disable him from performing his usual tasks as a workman in such a way as to enable him to procure and retain employment, a verdict in his favor on the issue of total permanent incapacity will be affirmed. Traders & General Ins. Co. v. Daniel, Tex.Civ.App., 131 S.W.2d 276.

The duration and extent of disability resulting from an injury is at best an estimate which must be determined by a jury from all of the pertinent facts before it. The issue as to disability may be established by the claimant alone, and this is true even though his testimony may be contradicted by medical witnesses. American General Ins. Co. v. Florez, Tex.Civ.App., 327 S.W.2d 643. A recent example of this last point is made in Texas Employers Ins. Ass'n v. Price, Tex.Civ.App., 336 S.W.2d 304. The plaintiff's doctor had testified that the plaintiff's back had been improved by the operation and estimated that plaintiff suffered 20 percent partial permanent disability. We quote from the opinion:

" * * * This testimony is not consistent with the finding of the jury and the testimony of appellee to the effect that he has sustained total and permanent incapacity. It is the province of the jury, however, to determine the weight to be given evidence and to reconcile conflicts or inconsistencies therein. 17 Tex.Jur. 408. The matter under consideration was not one for experts and skilled witnesses alone. Appellee testified that he could not work without pain, that his back was getting worse, that he was having to wear a brace with which he had previously been fitted by Dr. Brelsford. Dr. Brelsford testified that appellee had sustained permanent incapacity although not total, but that he would not pass him to follow his trade. The fact that appellee's testimony was in conflict with expert opinion testimony concerning the extent of his disability did not, under the circumstances, render it insufficient to support the verdict."

Again, in Angelina Casualty Co. v. Spencer, Tex.Civ.App., 310 S.W.2d 685, it is written:

"The question of duration of the incapacity of an injured person can never be answered precisely. The injured party's own statements about how he got hurt, where he hurts at the time he was testifying and what he is able to do and what he is unable to do, can serve only as aid to the jury in making some reasonable, fair estimate of the term of disability. The opinions of medical experts have been held not to be controlling and can also be only a matter of aid to the jury in making their reasonable estimate of the term of disability."

The plaintiff in the case at bar has been working almost continuously since returning to work following his operation, and under his own testimony has been doing most of the work required of him, although doing so, in pain. However, it is well settled that the fact a claimant continued to work and earn money since his injury is not controlling on the issue of total and permanent disability, but it is evidence to be considered with other facts and circumstances before the jury. Texas Employers Ins. Ass'n v. Cummings, Tex.Civ. App., 364 S.W.2d 255.

Also, the Commission of Appeals, wrote in Davies v. Texas Employers Ins. Ass'n, Tex.Com.App., 29 S.W.2d 987:

" * * * In determining the question of total permanent disability, that determination will not be controlled necessarily by the fact that the injured employee has been able, since the injury, to earn money. While the testimony we have stated tends to show that the employee had not suffered a total incapacity for work, as a proximate result of his injuries, it is not of that nature and character which, as a matter of law, has the legal effect to nullify the testimony which tends to show that he had so suffered. The jury exercised its privilege to decide the issue presented from all the facts in evidence adversely to the defendant in error, and, the verdict being supported by substantial testimony, we are

compelled to overrule these assignments."

Defendant presents an able argument in support of its position, and relies heavily upon Texas Employers Ins. Ass'n v. Moran, Tex.Civ.App., 261 S.W.2d 855, and Texas Employers Ins. Ass'n v. Vineyard, Tex. Civ.App., 316 S.W.2d 156. In each of these cases, the findings of total and permanent disability were found by the Court of Civil Appeals to be against the great weight and preponderance of the evidence. Also, in each of these cases, the plaintiffs had been able to *obtain* as well as *retain* employment. In the present case at bar, the plaintiff had stayed on the job with the same employer, and therefore had not passed a pre-employment examination, and being on the same job, had been able to get those following him on the next shift to perform some of the tasks required of him which he testified he could not do. The testimony of Dr. John Albert Brown that he would not pass the plaintiff for employment, together with the other testimony, raised an issue for the jury to determine, as to whether the plaintiff was physically able to obtain employment.

The Supreme Court said in Hargrove v. Trinity Universal Ins. Co., 152 Tex. 243, 256 S.W.2d 73:

"Since the workman coming under the terms of the Act is denied his common law rights it is held that the Act should be liberally construed in his favor. * * * A liberal interpretation will award him the greatest benefits the nature of his injuries will sustain."

The points are overruled.

If we be mistaken as to the waiver of the point of "no evidence", as mentioned before, we will consider the evidence favorable to the verdict and disregard all other. The point is overruled.

The trial court defined "injury" in the usual terms and included "incitement, acceleration or aggravation". Defendant contends this was reversible error inasmuch as the plaintiff had no pleadings which would sustain the 'incitement, acceleration or aggravation" portion of the charge. The trial court should not have included that portion of the definition in its charge, but the defendant has not demonstrated, and we do not see, how the defendant could be harmed under the circumstances in this case. The point is overruled. Rule 434, Texas Rules of Civil Procedure.

The other points raised by defendant having been considered and found to be without merit, are overruled.

Affirmed.