The STANDARD FIRE INSURANCE
COMPANY, Appellant,

v.

Richard Joseph SIMON, Sr., Appellee.

No. 17706.

Court of Civil Appeals of Texas,
Dallas.

Dec. 10, 1971.

Neal A. Hawthorn, Kenley, Boyland, Hawthorn, & Starr, Longview, for appellant.

David M. Kendall, Jr., Woodruff, Kendall & Smith, Dallas, for appellee.

GUITTARD, Justice.

In this workmen's compensation case the principal questions are whether the claimant is entitled to recover for the nursing services of his wife and mother-in-law and whether the evidence supports the verdict of total and permanent incapacity: The trial court allowed full recovery, and we affirm.

On November 3, 1967 Richard Simon, a truck driver, was in Wheeling, West Virginia, and was covering his load with a tarpaulin when he fell off his truck and fractured his skull, scapula, wrist and five ribs. After a week in the hospital in Wheeling, his wife, a graduate nurse, took him by ambulance to Pittsburgh, Pennsylvania, and brought him in a commercial airplane to Shreveport, Louisiana, and then in the back seat of an automobile to his home in Marshall, Texas. There is evidence that his wife and her mother, Mrs. Duncan, who was a licensed vocational nurse, took care of him from the time he left the hospital in Wheeling on November 10, 1967, to June 10, 1968.

Standard Fire Insurance Company paid Simon workmen's compensation benefits for seventy-nine weeks, but made no payments for nursing services.

The jury found that Simon was totally and permanently disabled as a result of the injury, that Standard failed to furnish reasonable and necessary nursing services, and that the reasonable cost of the nursing was $5,000 for the services furnished by Mrs. Simon and $4,000 for the services furnished by Mrs. Duncan. The trial court rendered judgment on the verdict.

In its first three points Standard complains of the judgment for nursing services on the ground that neither Mrs. Simon nor Mrs. Duncan made a claim before the Industrial Accident Board and neither is a party to this suit. As Standard concedes, a claim for medical or nursing expenses may be made by the employee in the district court even though no such claim was presented to the Industrial Accident Board, if it is incidental to the compensation claim. Maryland Casualty Co. v. Moore, 74 S.W.2d 769 (Tex.Civ.App., San Antonio 1934, affirmed and opinion approved, Tex.Comm'n App. 1937, opinion adopted, 102 S.W.2d 1118). Since this judgment awards no recovery to Mrs. Si-

mon or Mrs. Duncan, but awards recovery to Simon for the cost of such services, we find that such recovery is incidental to his compensation claim. Consequently these points are overruled.

In Points 4 and 5, Standard contends that there is no evidence, and, alternatively, insufficient evidence to support the jury's finding that it failed to furnish reasonable and necessary nursing services, since it had no notice that Simon required nursing services and no opportunity to provide them.

Authority for recovery of expenses for nursing services is found in the following language in Vernon's Ann.Tex.Rev.Civ. Stat.Ann., Art. 8306, Sec. 7 (1967):

"If the association fails to so furnish reasonable medical aid, hospital services, nursing, chiropractic services and medicines as and when needed after notice of the injury to the association or subscriber, the injured employee may provide said medical aid, nursing, hospital services, chiropractic services, and medicines at the cost and expense of the association. The employee shall not be entitled to recover any amount expended or incurred by him for said medical aid, hospital services, nursing, chiropractic services, or medicines, nor shall any person who supplied the same be entitled to recover of the association therefor, unless the association or subscriber shall have had notice of the injury and shall have refused, failed or neglected to furnish it or them within a reasonable time."

█ The only notice the statute requires is notice of injury. It does not require specific notice of a claim for medical or nursing services. Neither is a request for such services required as a condition of the insurance carrier's responsibility. Texas Employers' Ins. Ass'n v. Steadman, 415 S.W.2d 211 (Tex.Civ.App., Amarillo 1967, writ ref'd n.r.e.); Trinity Universal Ins. Co. v. Farley, 408 S.W.2d 776 (Tex.Civ. App., Tyler 1966, no writ). If the carrier designates a doctor for treatment, and the employee changes doctors or seeks other medical assistance without the carrier's knowledge or consent, the carrier is not liable for the unauthorized expenses, since it has not "failed" to provide them. Few v. Charter Oak Fire Ins. Co., 463 S.W.2d 424 (Tex.Sup.1971); Liberty Universal Ins. Co. v. Gill, 401 S.W.2d 339 (Tex.Civ. App., Houston 1966, writ ref'd n.r.e.). That is not the situation here. Standard furnished no nursing services after Simon left the hospital in Wheeling, though the evidence is ample that nursing services were necessary. Dr. Bob Herrin, who treated Simon over a period of several months after he returned from Wheeling, testified that persons with such injuries frequently remain in the hospital longer, but that he was willing to treat him as an out patient because he knew he would get adequate nursing at home. Standard's claim agent consented to pay Simon's plane fare back from Wheeling because he knew that Simon could get out of the hospital sooner because his wife was a nurse. Within two weeks after he got home, the agent visited him and found him in bed, and afterward dropped in to see him once a week. Though he says Simon appeared capable of taking care of his personal needs, the evidence shows that Standard had reason to believe that Simon needed and received professional nursing care for at least part of the period in question, but it never offered any payment for such care. The fact that Mrs. Simon did not decide to make a claim for such services until Standard stopped paying weekly compensation does not relieve Standard of its statutory obligation to provide nursing services "as and when needed after notice of the injury." We hold the evidence sufficient to support the finding that Standard failed to provide such services.

█ In its next group of points Standard challenges the sufficiency of the evidence to support the jury's findings that the nursing services were reasonable and necessary, and that the reasonable cost was

$5,000 for Mrs. Simon's services and $4,000 for Mrs. Duncan's services.

Mrs. Simon testified that when she went to West Virginia and brought her husband home, he could not walk without help and could not care for his basic needs. She provided nursing care on the trip, since he was sick all the way home. During the first three weeks after they got home, her employer let her off to take care of her husband, and she and Mrs. Duncan gave him nursing care around the clock in twelve-hour shifts. During that period he could not go to the bathroom without help and was unable to feed himself or provide his basic needs without assistance. After the first three weeks, the nursing was reduced to sixteen hours a day. Mrs. Duncan took care of him from 6:30 or 7:00 in the morning until she had to go to work at 3:00 o'clock in the afternoon. Mrs. Rasberry, a sitter, stayed with him until Mrs. Simon could get home from her job about 5:30 or 6:00. Mrs. Simon would then take care of him until bedtime, and sometimes had to be up with him at night. Mrs. Simon said the care they gave him was just basic nursing, bathing and feeding, making sure he got medicine, making him comfortable, and relieving his pain as much as possible.

The sitter testified that Simon could not take care of himself completely, was not able to get off the bed without help, could not go to the bathroom by himself for a month after the accident and could not dress himself for two months.

Simon gradually improved enough to get out of bed and start doing things for himself, but he complained of severe headaches and dizziness, could not walk straight, and would bump into things. Since his arm was in a cast, Mrs. Simon and Mrs. Duncan had to be careful that he did not fall and injure it again. On March 7, 1968 he went to the hospital for an operation to fuse the bones in his left wrist, and during the ten days he was in the hospital Mrs. Simon and Mrs. Duncan again nursed him around the clock in twelve-hour shifts.

In April, 1968, not long after his hospitalization for the wrist operation, Simon began to have blackout spells. Sometimes he would not respond for thirty minutes to two hours. According to Mrs. Simon, they were not able to leave him alone because they did not know when he was going to black out and need treatment. Once he was sitting on the side of his bed and they had to catch him before he fell on the floor. After several of these blackouts, Dr. Herrin referred him to Dr. James Shipp, a Shreveport neurologist. Dr. Shipp did a neurological examination and an electroencephalogram, and found that Simon had a brain injury and resulting convulsive disorder, generalized impairment of his coordination, and changes in his personality and higher mental processes. The blackouts were brought under control by anti-convulsant drugs, but mild seizures continued. Dr. Shipp felt a degree of security in allowing him to remain at home without spinal tests and arteriogram studies because his wife and mother-in-law were nurses.

According to Mrs. Simon, she and Mrs. Duncan continued to provide nursing care sixteen hours a day until July 10, 1968. In her opinion as a graduate nurse the nursing services which she and her mother provided were necessary in the proper care of her husband's injuries, and if they had not been provided, he would have had to be in the hospital. She testified that the usual charge for a graduate nurse was $23 for an eight-hour shift and $33.50 for a twelve-hour shift, and for a licensed vocational nurse like Mrs. Duncan, the usual charge was $18 for eight hours and $27 for twelve hours. In her professional opinion, these were reasonable charges, both for her services and for Mrs. Duncan's services. Applying these rates to the periods for which the nursing was provided, Mrs. Simon computed the charges for her services to be $6,005.50, and the cost of Mrs. Duncan's services to be $4,572.

The jury's findings of $5,000 for Mrs. Simon's services and $4,000 for Mrs. Duncan's services rest primarily on the testimony of Mrs. Simon, which has been summarized above. Since she was a graduate nurse, we hold that she was qualified to testify that the services were performed, that they were necessary for her husband's care, and that the charges were reasonable. Texas Employers' Ins. Ass'n v. Drews, 297 S.W. 630 (Tex.Civ.App., Dallas 1927, no writ); St. Louis, B. & M. Ry. Co. v. Davis, 262 S.W. 923 (Tex.Civ.App., Galveston 1924, writ dism'd); In re Stein's Estate, 177 S.W.2d 678 (Mo.App.1944). Standard's objections go to the weight of her testimony rather than its competency. Standard offered no rebutting testimony, and asked no questions on cross-examination about the nature of the nursing services from the time Simon entered the hospital on March 7, 1968 until July 10, the last day for which nursing services are claimed. The jury had no specific evidence to discredit the claim, but did discount it appreciably. We hold the evidence sufficient to support the findings of the necessity and cost of the nursing.

Standard also challenges the sufficiency of the evidence to support the jury's finding of total and permanent incapacity. The evidence shows that in November, 1969, two years after his injury, Simon got a job as local truck driver for a lumber company. He worked at that job until August, 1970, when the lumber company went out of business. He then obtained employment to drive a large diesel truck for Marshall Tiles, Inc. on long and short trips. He was in that employment at the time of the trial in November, 1970. He works regularly, earns an average of $120 a week, mows his lawn, goes fishing, and carries on a normal life so long as he takes his medicine. He says he can do inside work, but he does not like it and would rather drive a truck.

■ Though regularly employed, a workmen's compensation claimant may be totally disabled if the work causes him serious discomfort or unreasonable risk. Texas Employers Ins. Ass'n v. Smith, 374 S.W.2d 287 (Tex.Civ.App., Beaumont 1963, no writ); Employers Mutual Liability Ins. Co. v. Gallardo, 359 S.W.2d 933 (Tex.Civ. App., Waco 1962, writ ref'd n.r.e.). Here both Dr. Herrin and Dr. Shipp were firm in the view that a person subject to convulsive seizures, as Simon is, should not drive a truck. Dr. Shipp said that although it was safe 99.9 per cent of the time, he did not approve the truck driving because of the possibility of a serious accident. Both doctors were of the opinion that Simon was totally disabled to work as a truck driver and that his condition was permanent.

■ However, total disability to work in a particular occupation is not enough. To receive compensation for total incapacity, the claimant must be unable to get and keep employment requiring him to do the usual tasks of a workman. Texas Employers' Ins. Ass'n v. Mallard, 143 Tex. 77, 182 S.W.2d 1000 (1944). The question here, then, is whether the evidence shows that Simon could not get and keep employment in some other line of work requiring manual labor. We find the evidence sufficient to support the finding that his incapacity was total. An injured workman may be able to earn money at a job not requiring manual labor and still be totally disabled under the Workmen's Compensation Act. Aetna Casualty and Surety Co. v. Curlee, 416 S.W.2d 890 (Tex.Civ.App., Fort Worth 1967, no writ); Traders & General Ins. Co. v. Pittsford, 411 S.W.2d 755 (Tex.Civ. App., El Paso 1967, writ ref'd n.r.e.). Although Simon testified that he can do some type of work other than driving a truck, he has little other working experience. More than a year and a half after his injury he tried selling shoes and then working at a service station, but he was unable to continue in either employment. His memory is poor, his hearing is impaired, and he has some limitation of motion in his neck. He is left-handed, but his left wrist is stiff because of the fusion and he cannot lift any-

thing heavy with his left arm. He is still subject to convulsive seizures, which are controlled, but not eliminated, by medication four times a day. Even when he takes his medicine he has occasional dizzy spells and has to lie down when he tries to work too much and gets tired. On his present job he works with another driver, and when he feels bad he lets the other driver take over and lies down in a bunk in the cab. Dr. Herrin said that it is difficult for a person who must take anti-convulsant medicine to hold a job, and though he might do sedentary work under special conditions, he would have to have an understanding with his employer about that. Considering the record as a whole, we cannot say that the evidence is insufficient to support the finding of total and permanent incapacity.

Affirmed.