**CONNECTICUT INDEMNITY COMPANY,**
Appellant,

v.

**Billy Roy HENSON, Appellee.**

No. 14515.

Court of Civil Appeals of Texas.

Houston.

March 4, 1965.

Rehearing Denied March 25, 1965.

Dollahon & de Ybarrondo, Willard Dollahon, Houston, for appellant.

Richard P. Hogan, Helm, Jones & Pletcher, Houston, for appellee.

WERLEIN, Justice.

Appellant, Connecticut Indemnity Company, has appealed from a judgment based upon a jury verdict in a workman's compensation case awarding appellee payments for permanent total disability.

Although appellant has complained that there is no evidence to support the jury's answers to special issues finding total incapacity and that such total incapacity was permanent, appellant relies mainly upon its Points 2 and 4 complaining respectively that the jury findings of total incapacity, and that it was permanent, are against the great weight and preponderance of the evidence. These assignments require a careful examination of the entire record.

Appellee Henson testified that at the time of his injury on April 12, 1962 he was working for Funway Boat Sales, Inc., a retailer of boats, and had been working for such company for 22 months, driving a truck and transferring boats back and forth from Houston to Freeport and Seabrook, and also

carrying boats from various boatyards to the Company's yard for repair; when he handled large boats like a 25 foot or 30 foot boat he had a helper; that on the occasion of his injury a customer had brought in a 16 foot fiberglass boat to have its 70 h. p. outboard motor or engine worked on; the boat which weighed about 1200 pounds was on the ground beside the shop, leaning on one side of the building; pursuant to instructions he bent over and undertook to lift up and pull the boat half way up on the trailer so that the bow would be up in the air and the water would drain out of the boat; that as he did so he felt something sharp in his back, dropped the boat and fell to his knees and called for help; one Newman, a helper, came out and grabbed hold of him while he was still on his knees; Newman helped him up from the ground, and then Newman and one Smith braced him up and stood him up against a wall because he could not sit down; the pain which he experienced was in the upper part of his back and extended into his neck; that the accident happened about 10 o'clock in the morning and about 12 they took him to Dr. Baier; that his uncle later took him home; he had never had any trouble with his back before; he was 29 years old and about 6 feet tall and weighed about 184 pounds, was married and had two children of his own and a stepchild; that he had had only a tenth grade education; that at the time of the injury he was making approximately $70.00 per week, or $1.20 per hour; his work required lifting.

He also testified that Dr. Baier told him to go home and apply hot water bottles and towels to his back and take aspirin; Dr. Baier gave him chiropractic treatments and adjustments every day except Saturdays and Sundays for some six weeks, and on June 20 he returned to his employer's place of business for light work; he undertook to sweep the floors with a push broom, but he could not do it because of the pain in his neck and back, and he was sent home; that he continued to see Dr. Baier but the adjustments and treatments did not relieve

him at all; he had to sleep on the floor many times; that about July 1 he was referred to Dr. Brodsky by his employer, and Dr. Brodsky took x-rays of his entire body, head and back; he was given therapy treatments and shots in his upper back in the area of his pain; that he was given about 10 heat treatments in Dr. Brodsky's office, and given pills to take; the treatment helped his head and neck but did not relieve his back; that only one thing cleared up and that was the swollen knot, or swollen place, on his back. About two weeks after his last treatment at Dr. Brodsky's he went to see Dr. Reece, a chiropractor, to whom he had been referred by his attorneys.

He further testified that he couldn't do any work at the time he went to see Dr. Reece, and that after he went to see Dr. Reece and was being treated by him, he undertook to work for the Melton Brothers Texaco station; his employer had never called him back, and he couldn't do any lifting; that his father worked for Mr. Melton at his Texaco station; he explained to Mr. Melton that he had been trying to get jobs elsewhere but had a back injury, and Mr. Melton on August 6, 1962 hired him at the Texaco station to work on the front; he worked there from August 6, 1962 until June, 1963, but during such period of about 10 months he lost one month because of his back; that his back would start giving him trouble and he would have to be off and go to the doctor; Mr. Melton let him go because he was missing too much time, and he had to have someone there who could do the work on time and stay there; that thereafter he went to work for Bill O'Day's Gulf Station and worked approximately a month; he tried to wash cars but couldn't do it; he washed about 10 cars that week but missed two days because of his back; he did no greasing or tire changing; he asked to be allowed to work on the front; he worked there about a month, and then was laid off because the manager said he did not have enough business to pay a man $60.00 or $65.00 a week just to work on the front, and he had to have somebody else who could

work on the front and also wash cars and do everything; that he then went to work for Bob Matthews Hancock Service Station as night manager, working by himself after 9 o'clock at night, and he worked about 12 hours a day just pumping gasoline and not doing any greasing or anything of that nature or any tire work; that he worked there until September 9, 1963 when the station was sold, and he did not stay on with the new owner; that after leaving Hancock he went to work at the Katy Road Gulf Station tuning up and putting in plugs, and points in distributors; he did not change radiators or starters or pull generators; that he worked for the Katy Road station from the latter part of September until around November 19, 1963, when he was laid off because he was asked to change a truck tire and he told the manager he couldn't do it. He then called his father and asked him to talk to Mr. Melton and see if he would employ him again. He went to work on November 25, 1963 as front man at Melton's, pumping gas and wiping windshields, and was still working there when his case went to trial on March 3, 1964.

Appellee testified that he still had pain in his back at the time of the trial and that he could not do any kind of heavy labor or perform the usual tasks of a workman on a job of like nature that he had at Funway Boat Sales, and that he didn't think he would ever be able to do so in the future; that other than the job at Melton's Texaco station, which his father helped him get, he had never applied for any other job from November, 1963, to the time of the trial; and that he could no longer play baseball or bowl as he had done prior to his injury. He said on cross-examination that he had greased his own car twice and had loosened some lugs on wheels with an electric wrench weighing about twelve pounds; that if he were able to grease cars and fix tires he would make more money; he has tried to lift or bend and as a result has suffered pain which lasted from four days to a week.

Dr. Reece, who was called by appellee as a witness, testified that he had seen appellee and treated him some six or eight times between July 31, 1962 and February 18, 1964, about two weeks before the case went to trial; that appellee had nerve root irritations and muscle spasms when he first examined him; that when he last saw appellee he was still having pain in the same area as he did when he first saw him; the pain was no greater, "maybe slightly less than the first time"; that he wouldn't think appellee could go out and do manual labor over a period of time and that manual labor such as picking up heavy boats, and also long standing and walking and things of that kind would aggravate appellee's condition; he gave appellee instructions to refrain from lifting and things of that nature, and instructed him as to ways in which to seat himself. When asked whether he had any idea when appellee's condition would clear up, he stated he just could not see that far in the future; and that if appellee went out and did heavy work as just described, he did not think appellee's condition would ever clear up.

Dr. Brodsky, an orthopedic surgeon, called by appellant, testified on direct examination that on May 28, 1962 there were no objective findings made by him, but there were subjective complaints, and he assumed appellee had a sprain of the muscles. For this condition he injected the appellee in the muscles and ligaments with zylocaine and orthopedic hydrocortisone, and followed with ultra sound, heat, massage and exercises. He testified that he took x-rays and that appellee had no muscle spasm that he could detect, but on cross-examination the doctor, reading from his report sent to the insurance company on May 28, 1962, stated: " * * * x-rays show loss of lordotic curvature, indicating muscle spasm."

Dr. Baier, the chiropractor, who treated appellee immediately after his injury, and who was a stockholder in Funway Boat Sales, appellee's employer, testified there was a correlation between the point of tenderness he found and the point where appellee told him he suffered pain. He testified that in the mid dorsal regions emitting

between the fourth and fifth dorsals, there was some tenderness next to the spine where the nerve comes out of the spine and goes to the muscles. He gave appellee a chiropractic adjustment to relieve the tension and the muscle spasm in the trapezius muscle, and he required appellee to return for additional treatments to relieve the rest of the spasm. He also suggested the application of hot towels to the muscle to cause better blood supply and circulation; there was very slight improvement or reduction in the muscle spasm in the first 24 hour period. He x-rayed appellee's back, and on or about May 4 dismissed him to resume light duties although he couldn't do any heavy lifting for several weeks.

■ We have carefully read the testimony of all the witnesses in an effort to determine whether the findings of the jury are so against the weight and preponderance of the evidence as to be manifestly unjust. The testimony of the doctor and chiropractor called by appellant seems to refute appellee's claim of total permanent disability. There is no definite medical testimony to the effect that appellee's incapacity was both total and permanent. It is recognized, however, that the testimony of the injured party may outweigh that of a medical witness who is not confronted with the problem of living with the injury and who is generally not in as good a position as the injured party to evaluate the severity and extent of his pain and the disabling effects thereof. Furthermore, there is no fixed rule of evidence by which a claimant is required to establish the fact that he has suffered an injury that caused permanent total disability. See Traders & General Insurance Company v. Daniel, Tex.Civ.App., 131 S.W. 2d 276, writ dism., judg. cor.; 45 Tex.Jur., p. 589, par. 162. As stated in Employers Reinsurance Corporation v. Jones, Tex. Civ.App., 195 S.W.2d 810, 812, writ ref., n. r. e.: "The duration and extent of a disability resulting from injury is at best

an estimate which must be determined by a jury from all the pertinent facts before it." The issue as to disability may be established by the claimant alone, and this is true even though his testimony may be contradicted by medical witnesses. 45 Tex.Jur., p. 592, Sec. 163.

■ The fact that appellee was unable to perform the kind of work he was doing at the time of his injury or was unable to earn the wages he was paid at such time would not alone establish that he was totally incapacitated. Our Supreme Court, in Texas Employers Ins. Ass'n v. Mallard, 143 Tex. 77, 182 S.W.2d 1000, approved the following definition of total incapacity:

> " 'The term "total incapacity" (or total disability), as used in this charge, does not imply any absolute disability to perform any kind of labor, but a person disqualified from performing the usual tasks of a workman, in such a way as to enable him to procure and retain employment, is regarded as being totally incapacitated, or totally disabled.' "

■ Appellee's testimony, in our opinion, shows that he was totally incapacitated within the meaning of that term as approved by our Supreme Court. The evidence is uncontroverted that he could not do the work that he did at the time of his injury. But more important is the fact that he was laid off or discharged three times because of the condition of his back, and his inability to perform the usual tasks of a workman in jobs which he was able to secure but could not retain. It seems clear that he can do only light work and cannot retain employment for any length of time or without assistance or special consideration. He secured the filling station job in which he was employed at the time of the trial with the help of his father who was employed as a "lube" man at Melton's filling station. His work was limited to pumping gas and wiping windshields, and did not embrace the usual tasks of a workman en-

gaged in the work of a filling station attendant.

■ We have found it more difficult to determine whether the evidence is sufficient to support the jury's finding that appellee's incapacity is permanent. There is no medical testimony that appellee's condition is permanent. We are of the opinion, however, that the permanency of a physical condition may be shown by circumstantial evidence under certain conditions. The fact that appellee's condition had remained practically the same for nearly two years from the time of the accident until the time of trial may be considered as some evidence of permanency. Neither Dr. Brodsky nor Dr. Baier, the chiropractor, had seen appellee for a period of approximately a year and a half and were not in a position to testify as to appellee's condition at the time of the trial. Appellee testified that his back was still hurting at the time of the trial and that he was "still having the same trouble and it's getting worser." Dr. Reece testified that he had seen appellee some two weeks before the trial and he was still having pain in the same area as he did when he first saw him, and that he did not think appellee could go out and do manual labor over a period of time such as he had been doing, and that long standing and walking and things of that nature would aggravate his condition, and that if appellee undertook to do heavy work his condition would never clear up, and further that he could not see far enough in the future to determine when appellee's back condition would clear up. From this evidence and testimony showing that appellee's total incapacity or disability had continued unchanged down to the time of the trial and would continue indefinitely in the future, the jury found that such incapacity was permanent.

In Travelers Insurance Company v. Wade, Tex.Civ.App., 373 S.W.2d 881, writ ref., n. r. e., the court used the following language which is applicable to the instant case:

"Notwithstanding the general rule prohibiting a lay witness from expressing an opinion that injuries are total and permanent, it is well settled that the factual testimony of a claimant alone, or of other lay witnesses, will support a jury finding of total permanent disability. The jury may reasonably infer total and permanent disability from circumstantial evidence. And this is true though the lay evidence may be contradicted by the testimony of medical experts. Travelers Ins. Co. v. Helstrom, Tex.Civ.App., 351 S.W.2d 321, err. ref. n. r. e.; Consolidated Casualty Ins. Co. v. Baker, Tex.Civ.App., 297 S.W.2d 706, err. ref. n. r. e.; The Ins. Co. of Texas v. Anderson, Tex.Civ.App., 272 S.W.2d 772, err. ref. n. r. e.; Western Casualty & Surety Co. v. Mueller, Tex.Civ.App., 169 S.W.2d 223, err. ref. w. o. m.; American Motorists Ins. Co. v. Black, Tex.Civ.App., 253 S.W. 678, no wr. hist.; Lumbermen's Mutual Casualty Co. v. Zinn, Tex.Civ.App., 220 S.W.2d 906, err. ref.; Lott v. American Surety Co. of N. Y., Tex.Civ.App., 140 S.W.2d 928, no wr. hist. It is to be remembered that the Workmen's Compensation Act is to be liberally construed in favor of the claimant. Hargrove v. Trinity Universal Ins. Co., 152 Tex. 243, 256 S.W.2d 73."

After examining all of the testimony, both that supporting the verdict and that militating against it, we cannot say that the jury's findings of total and permanent incapacity are so against the overwhelming weight and preponderance of the evidence as to be manifestly wrong and unjust. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660.

Judgment affirmed.