**TEXAS EMPLOYERS' INSURANCE ASSOCIATION, Appellant,**

v.

**Carnell WASHINGTON, Appellee.**

No. 17228.

Court of Civil Appeals of Texas.

Dallas.

Jan. 24, 1969.

Rehearing Denied Feb. 14, 1969.

Wayne Pearson, of Burford, Ryburn & Ford, Dallas, for appellant.

Fred R. Brown, of Brown & Bowen, Garland, for appellee.

CLAUDE WILLIAMS, Justice.

Texas Employers' Insurance Association appeals from a judgment in a workmen's compensation case wherein Carnell Washington was awarded total and permanent disability benefits as a result of an injury sustained by him in the course of his employment by Crown Sash & Door Company in Dallas County, Texas on April 5, 1967. The judgment was based upon a jury verdict in which it was found (1) that Washington sustained an injury on or about April 5, 1967; (2) that such injury was accidental; (2–A) that such injury was received by Washington while in the course of his employment with Crown Sash & Door Company; (3) that Washington sustained total incapacity following such injury; (4) that the injury was a producing cause of the total incapacity; (5) that such total incapacity began on April 11, 1967 and (6) that such total incapacity was permanent.

In its brief on appeal appellant makes no attack upon the jury findings that appellee sustained an injury within the course of his employment and that such injury resulted in total disability. These findings must, therefore, be accepted as having valid support in the evidence. Appellant bases its entire appeal upon three points of error in which it says that while there was some evidence that Washington sustained total temporary disability following his injury the court erred in rendering judgment on the verdict (1) for the reason that there is no evidence to support the answer to Special Issue No. 6 wherein it was found that plaintiff's total incapacity is permanent; (2) there is insufficient evidence to support the answer to Special Issue No. 6; and (3) the answer of the jury to Special Issue No. 6 is so contrary to the great weight and preponderance of the evidence

as to be manifestly wrong and unjust. These "no evidence" and "insufficient evidence" points have required us to review the record in the light of the landmark rules announced by our Supreme Court in In re King's Estate, 150 Tex. 662, 244 S.W. 2d 660 (1951). The following is a summarization of the material facts revealed by the record:

Appellee Washington, a colored male, twenty-seven years of age, had been engaged in performing manual labor all of his active life. He had been continuously employed by Crown Sash & Door Company in Dallas for over three years prior to April 5, 1967, being employed as a jamb setter which required lifting, bending and stooping. During the year immediately prior to April 5, 1967 he had worked a total of 262½ days. He had never experienced any trouble with his back or other parts of his body before April 5, 1967 nor had he ever had any treatment of his back by any doctor before that time. Prior to April 5, 1967 he said he was in "A-one shape", good condition, and was able to do and did perform his work consisting of lifting heavy things, stooping and bending. On April 5, 1967 while working for his employer he went to the second floor of the premises to get some door jambs to be worked on. These jambs were stacked up to a height of about 7½ feet from the floor and the stack weighed between 1500 and 1600 pounds, or even more. He was standing between two stacks, in an area about two feet wide, and reached up and tried to get some jambs from the top of the stack. While in that position one of the stacks began to lean over and fell over on top of appellee. He made an effort to try to hold the stack off of his body but the weight pressed down upon him so that his back was also pressed against the jambs to his rear. He was thus placed in a position of being pressed from both front and rear by the weight of the jambs coming down on top of him. He called out for help and a fellow employee, Ray Guinn, came to his rescue. It required the total strength of

both Guinn and appellee to push the jambs back up and off of appellee. He told Guinn, "Ray, I believe I done hurt myself." Appellee said he knew immediately that he had hurt his back as a result of the injury; that he felt a severe, sharp pain in the center of his back, right about the belt line and slightly below it, as well as feeling a sharp pain in his left leg. However, he said he continued to work the rest of that day, Wednesday, and also worked Thursday and Friday without telling any of his superiors about his injury and pain. He was off Saturday and Sunday and returned to work on Monday and said that he performed his work with pain. He said that after his back was hurt on Wednesday it continued to pain him and the pain got worse each day. On the following Tuesday, six days after the accident, he reported it to his superintendent. On that day his back was hurting so bad he couldn't do anything and his fellow employees tried to help him. His superintendent sent him to see Dr. Montgomery at Dallas Medical & Surgical Clinic on Tuesday. Dr. Montgomery took x-rays of his back and gave him a prescription. He returned to Dr. Montgomery four days later and was sent to a Dr. Beckering. Dr. Beckering x-rayed him and put a back brace on him and gave him a prescription. He returned to see Dr. Beckering a total of about five times and was given more prescriptions. He continued under the care of Dr. Beckering for about a month or until about May 15, 1967. Appellee next went to a Dr. Judge Page. Dr. Page, an M. D., x-rayed appellee and gave him an examination, following which he put him in the hospital where he remained some thirteen days. While he was in the hospital he was x-rayed and received heat treatments on the low back as well as shots and medication. He was never released by Dr. Page to return to work and was under the care of Dr. Page at the time of the trial in April 1968. Following his discharge from the hospital appellee was under the continuous treatment of Dr. Page and during this period of time his pain in his back and left leg did not improve but actually got worse. He said he would receive temporary relief from Dr. Page's treatment but the hurting would return and that he continued to have a sharp pain in his back and left leg. He said he could hardly walk on his left leg half of the time and that if he tries to do any activity involving lifting, bending or stooping the pain increases. He said he found it necessary to use something to help him walk and he first used a broom handle and then got himself a cane which he uses to walk with. He said he was not able at the time of the trial to do the work he was doing for his employer because it involved a lot of lifting and that causes his back to hurt. The only kind of work he knew to do was manual labor and he could not do this. He says the pain in his left leg and back was more severe at the time of the trial than it was in May 1967. He has done nothing since April 11, 1967, even house work, and has to stand a good part of the time because it hurts him to sit down. He was examined about four months prior to the trial by a Dr. Hodges who x-rayed his back but gave him no treatment and was also examined by Dr. Simpson, who examined him but made no x-rays and prescribed no treatment. He wears the back brace prescribed by Dr. Beckering all the time.

Ray Guinn testified that he saw appellee pinned between the stacks of jambs and that he rushed to him and helped get him free. He noticed immediately that appellee had a very unusual frown on his face. He said after that occasion appellee was unable to keep up with his work and got slower and slower in his work so that he and the other employees pitched in and helped appellee keep up and keep the job going. He said that before the injury appellee had been regular in attending to his work and was a good, hard worker. On the day appellee went to the doctor he noticed that he was dragging around and that when he would bend over he could not straighten up.

Jack C. Alexander, a groceryman, testified that he had known appellee prior to April 5, 1967 and that he had always found him to be honest and paid his debts. Following April 5, 1967 he had had occasion to observe appellee many times; that it took him three to five minutes to get out of the car and into his store; that he has to help appellee pick up and carry any items that are down low; that he has observed that appellee does not get around like he used to; that he uses a cane and walks slowly. He has observed that appellee acts like he is hurt and that he has a different facial expression. He can see that appellee wears a back brace.

Johnny C. Brown testified that he was the assistant foreman at appellee's place of employment on April 5, 1967 and verified that appellee went upstairs to get some door jambs and when he returned, after some delay, with his fellow employee Guinn, he told Brown that he had hurt his back. Prior to April 5 appellee had been a good worker but after that time he noticed that appellee was slow all of the time, could not seem to bend his back and it took from five to six minutes to get in a car. Appellee complains of hurting and he noticed that he cannot get around like he did before and walks with a cane.

Appellee's wife testified that since April 5, 1967 she has noticed a difference in appellee's bending and lifting and in his sleeping. In his sleeping he tosses, turns, moans and groans. In walking, he walks with a limp, uses a cane and walks "like an old man." He has trouble bending down and most of the time she laces his shoes. In the last six or eight months it seems to her that appellee is getting worse.

Appellee offered no medical testimony.

Appellant produced Dr. Charles W. Simpson, a neurosurgeon, who testified that at the request of appellant he examined appellee in his office on April 10, 1968. He did the usual neurological examination but made no x-rays of appellee's body. In the examination he had appellee walk on his heels and toes and do forward bending. In performing these tests appellee did them "haltingly and with difficulty" and "vocally complained of pain and discomfort." He had him bend forward and found restriction and limitation because of what he called "subjective feeling of discomfort." He described subjective findings as those which have to be interpreted by the patient, whereas objective findings are those you can supply with some degree of judgment of your own. He said that pain is nearly always subjective. He said that in performing the examination of appellee's back he found muscle spasm which he described as "subjective" and "guarding". He said that this guarding was unnatural and that, in his opinion, not justified. He found that appellee was not able to move through what is a normal range of motion because of the expressed pain and also found that "he could not stand on his left side" alone, unsupported, because of expressed pain. He testified that he had found that appellee had weakness in the muscles of the left leg which is also subjective and that he did not really believe that such weakness was real because he would probably have had other findings which were nonexistent. In his examination of the hip joint, knee joint and ankle, and other joints, he found all the groups of muscles involved in all of these movements to be weak but he did not believe this weakness because if such were true you would find atrophy or wasting away of muscles which was not present in this case. As a result of his sensory examination of appellee he found evidence of pain but he did not believe this to be valid because of nerve distribution. He thought appellee's subjective reaction to the sensory test was unreal. He performed mechanical tests dealing with stretching of the nerves by lifting the legs, and as a result of these tests he said he did not believe appellee's complaints of pain and disability in those areas were real. He said he found no objective findings of any disease of the nervous system or of any disease which would cause him any incapacity. On cross-examination the doctor

testified that the complaints of pain in the areas of the back and leg were symptoms of a ruptured intervertebral disc but again on redirect examination the doctor said:

"Q Counsel asked you a great deal about discs, or ruptured discs, or herniated discs. Was there anything in your examination, or anything in your findings, that would in any manner suggest to you that this man had a herniated or a ruptured disc?

A I found no evidence that I would associate with a ruptured disc, other than what I interpreted from the subjective findings, the pain he complained of, the pain in the low back, which is associated with discs."

Again the doctor testified that he had made a written report to Texas Employers' Insurance Association following his examination and in this report he said:

"He walks with a decided limp, he favors his left leg," * * * "He is unable to perform the heel and toe walk, he cannot squat without considerable pain; there is tenderness on palpation, rubbing of these lumbo-sacral areas of the low back * * * areas of moderate muscle spasm of the paravertebral musculature"; * * * "The range of motion of the back is restricted"; * * * "The left lateral bending is also accompanied by grabbing his left side"; * * * "Retroflection causes considerable discomfort to the low back. On percussion tests there is tenderness in all of the spinous processes, L–3 through S–1."

Concluding the cross-examination the doctor said:

"Q Now, if you believe him, Doctor, if you believe him, this man can't work, can he?

A By virtue of the fact he says he can't work.

Q All right; of course, if you don't believe him, then there's not a thing wrong with him?

A That's a problem of subjective—

Q Right, and—

A All of these symptoms are purely subjective.

Q That's right.

A I can stand here and create the same thing for my own back, is what I meant."

## OPINION

■ Again, we are confronted with another in a series of appeals that have been presented in recent years to this court, as well as other appellate courts, both state and federal, in which the insurance carrier has seriously sought to strike down a jury finding of permanent disability where the injured workman produced no medical testimony incorporating an opinion relating to permanency of the injury but relies solely upon lay testimony, or medical testimony from other sources, that the total incapacity will be permanent. On three occasions in recent years this court, in cases involving similar factual situations, has had occasion to reannounce the rule, which we believe to be well established in Texas jurisprudence, that permanent disability may reasonably be inferred from circumstantial evidence produced by lay witnesses and this is true even though such evidence is contradicted by the testimony of medical experts. Travelers Ins. Co. v. Wade, 373 S.W.2d 881 (Tex.Civ.App., Dallas 1963, writ ref'd n. r. e.); Travelers Ins. Co. v. Arnold, 378 S.W.2d 78 (Tex.Civ.App., Dallas 1964, no writ); and Texas Employers Ins. Ass'n v. Hoover, 382 S.W.2d 174 (Tex.Civ.App., Dallas 1964, writ ref'd n. r. e.).

This general rule is announced in 63 Tex. Jur.2d, § 429, p. 455, and followed in many cases, such as Texas Employers Ins. Ass'n v. Smith, 374 S.W.2d 287 (Tex.Civ.App., Beaumont 1963); Fidelity & Cas. Co. of New York v. Moore, 333 S.W.2d 956 (Tex. Civ.App., Fort Worth 1960); Connecticut

Indemnity Co. v. Henson, 388 S.W.2d 300 (Tex.Civ.App., Houston 1965); Texas Employers' Ins. Ass'n v. Hamilton, 430 S.W.2d 285 (Tex.Civ.App., Fort Worth 1968, writ ref'd n. r. e.); Hartford Accident & Indemnity Co. v. Ferguson, 417 S.W.2d 376 (Tex.Civ.App., Fort Worth 1967); Fireman's Fund Ins. Co. v. Martinez, 387 S.W.2d 443 (Tex.Civ.App., Austin 1965, writ ref'd n. r. e.); and Travelers Ins. Co. v. Rudy, 340 F.2d 132 (5th Cir. 1964).

Appellant recognizes the rule of law announced in each of these cases and denies that its attack on the jury's answer to the issue relating to permanent disability is predicated upon the absence of medical evidence or is contrary to medical opinion. It argues that this record demonstrates that there is no evidence and insufficient evidence, direct or circumstantial, from any source, to support a finding of permanent incapacity. It bases its contention on two cases, Travelers Ins. Co. v. Linder, 368 S.W.2d 797 (Tex.Civ.App., Waco 1963, writ ref'd n. r. e.), and Montoya v. American Employers Ins. Co., 426 S.W.2d 661 (Tex.Civ.App., El Paso 1968, no writ).

We are unable to agree with appellant's contention and overrule same. While it is true that no witness, either lay or medical, testified affirmatively that appellee's total disability would be permanent, in so many words, such fact of permanency may be revealed by other facts and circumstances from which the jury may reasonably resolve the issue. It must be remembered that there is no fixed rule of evidence by which a claimant in a workmen's compensation case is required to establish the fact that he has suffered an injury that caused permanent disability. Traders & General Ins. Co. v. Daniel, 131 S.W.2d 276 (Tex.Civ.App., El Paso 1939, writ dism'd, cor. jdgmt). Proof of duration and extent of a disability resulting from injury is, like the assessment of damages in a personal injury action, at best an estimate which must be determined by a jury from all of the pertinent facts before it. Employers Reinsurance Corp. v. Jones, 195 S.W.2d 810 (Tex.Civ.App., Beaumont 1946, writ ref'd n. r. e.). It would be improper and objectionable for a layman to give his opinion concerning the future extent of disability. While a medical expert is able to give his opinion on this question yet the jury is not bound to accept such opinion and may disregard same. As Chief Justice Dixon of this court said in Travelers Ins. Co. v. Wade, supra:

"Notwithstanding the general rule prohibiting a lay witness from expressing an opinion that injuries are total and permanent, it is well settled that the factual testimony of a claimant alone, or of other lay witnesses, will support a jury finding of total permanent disability. The jury may reasonably infer total and permanent disability from circumstantial evidence. And this is true though the lay evidence may be contradicted by the testimony of medical experts."

Also, as aptly stated by Justice Bateman in *Arnold*, supra:

"Any doubt we may have as to whether this evidence actually supports the jury finding of permanent incapacity must be resolved in favor of the right of the injured workman to receive compensation. [Citing authorities.]

"The jury had the right to believe all of appellee's testimony and, observing what they could of his physical condition in the court room, to conclude that he was totally disabled and that such incapacity was permanent."

The same argument advanced by appellant in this case was presented in the case of Hartford Accident & Indemnity Co. v. Ferguson, 417 S.W.2d 376 (Tex.Civ.App., Fort Worth 1967), and the appellate court declined to accept such contention, citing many cases to the effect that the issue of permanency may be decided by the jury based upon lay witnesses only.

In this case the evidence from appellee and his lay witnesses establishes conclusively that he sustained an injury which resulted in his total incapacity. Appellant does not deny these facts. The testimony of appellee and his lay witnesses concerning his continued and increased pain in his body; his method of walk; his lack of ability to move about, bend and stoop as he did before; and many other illustrations of physical condition indicative of disability to work and perform labor, all afford the jury direct and circumstantial evidence upon which they could reasonably conclude that the condition will be permanent. We add to this the medical testimony of Dr. Simpson, a witness for appellant, who frankly admitted that he found certain physical conditions to exist in this man but he discounted and disbelieved such conditions because they were, in his opinion, based on subjective symptoms or what appellee had told him. In other words, the doctor elected not to believe appellee and therefore rendered an opinion that appellee was not suffering any disability. The jury was not bound or required to believe the doctor's opinion but could, and undoubtedly did, elect to believe that the symptoms and findings elicited from appellee by the doctor were, in fact, valid. Dr. Simpson candidly stated that the symptoms recited and related by appellee were those usually found in a case of ruptured intervertebral disc, but since he did not believe appellee then he concluded that he did not have a ruptured disc. The jury apparently elected not to believe Dr. Simpson's opinion but did believe the symptoms and findings developed from the physical examination. We think that when all of the testimony is viewed as a whole it falls clearly within the rules of law above announced concerning the finding of permanency. Certainly when we disregard all of appellant's testimony and view the evidence in the light most favorable to appellee, as we are required to do in evaluating the "no evidence" point of error, we find no difficulty in concluding that there was some evidence of probative force to justify the answer of the jury to Special Issue No. 6 concerning the permanency of appellee's incapacity to work and labor. Also, when we view the evidence as a whole and give weight to all of the same, as we are required to do in evaluating the "insufficient evidence" point we cannot say that the evidence is insufficient nor contrary to the great weight and preponderance of the evidence. We find ample distinction between this case and those of Linder and Montoya, supra, relied upon by appellant and therefore conclude they are not authoritative here.

We overrule appellant's three points of error and affirm the judgment of the trial court.

Affirmed.